No. 26-1021

In the
UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

ENBRIDGE ENERGY, LP; ENBRIDGE ENERGY COMPANY, INC., AND ENBRIDGE ENERGY PARTNERS, L.P.,

Plaintiffs-Appellees,

v.

GRETCHEN WHITMER, the Governor of the State of Michigan in her official capacity, and SCOTT BOWEN, Director of the Michigan Department of Natural Resources in his official capacity,

Defendants-Appellants.

Appeal from the United States District Court
Western District of Michigan, Southern Division
Honorable Robert J. Jonker

**BRIEF FOR DEFENDANTS-APPELLANTS**

Keith D. Underkoffler
Echo Aloe
Assistant Attorneys General
Counsel of Record
Environment, Natural Resources, and Agriculture Division
P.O. Box 30755
Lansing, MI 48909
(517) 335-7664

Daniel P. Bock
Special Assistant Attorney General
Fahey Schultz Burzych Rhodes PLC
4151 Okemos Road
Okemos, MI 48864
(517) 312-3130

*Counsel for Defendants-Appellants*

Dated:  May 4, 2026

## CORPORATE DISCLOSURE

State governments and state agencies are excepted from filing a corporate affiliate/financial interest disclosure statement.

i

## TABLE OF CONTENTS

Page

Corporate Disclosure ........................................................................i

Table of Contents ............................................................................ii

Table of Authorities........................................................................vi

Statement in Support of Oral Argument...............................xvi

Jurisdictional Statement...............................................................1

Statement of Issues Presented.....................................................2

Introduction .....................................................................................3

Statement of the Case ....................................................................5

    A.   The State of Michigan's ownership of the submerged
         lands beneath the Straits of Mackinac...................................5

    B.   The 1953 easement contract ..................................................6

    C.   The Straits Pipelines and proposed tunnel project ................8

    D.   The Attorney General's lawsuit..............................................9

    E.   Notice of Revocation and Termination of Easement............10

    F.   The Governor's lawsuit .........................................................12

    G.   U.S.-Canada dispute resolution............................................13

    H.   This lawsuit..........................................................................14

    I.   The opinion below ................................................................15

    J.   This appeal ...........................................................................16

Standard of Review ......................................................................16

Summary of Argument.................................................................17

Argument.................................................................................................19

I.     The district court erred by holding that the Notice is
       expressly preempted by the Pipeline Safety Act. ...........................19

       A.     Legal standard .................................................................20

       B.     The PSA does not govern pipeline location or land
              rights. .............................................................................21

       C.     Section I.B of the Notice is not preempted because the
              State's obligation to make "due findings" when
              granting easements is not a pipeline safety standard. ........25

              1.     The PSA does not preempt the State's regulation
                     of its own conduct as trustee of public lands...............27

              2.     The PSA does not govern property rights. ..................29

              3.     The PSA does not preempt safety considerations. ......30

       D.     Section II of the Notice is not preempted because the
              PSA did not retroactively nullify the terms and
              conditions of the 1953 easement contract...........................32

              1.     The PSA does not divest the State of its
                     proprietary rights as landowner................................34

                     a.     Private landowners may enforce the terms
                            of easement contracts. .......................................34

                     b.     Congress did not intend to treat states
                            worse than other landowners. ............................36

                     c.     The State acted as landowner, not
                            regulator, when it terminated the 1953
                            easement. ..........................................................38

              2.     The PSA does not retroactively nullify the terms
                     of the 1953 easement. ................................................41

      a.      Congress intended to preempt regulations, not to retroactively invalidate contracts. ........... 43

      b.      Statutory context confirms that Congress did not retroactively invalidate the 1953 easement's terms................................................ 45

    3.    If the PSA *does* render the essential terms of the 1953 easement unlawful, the entire contract fails, and Enbridge has no right to use the State's land...... 48

II.    The district court erred by holding that the Notice is impliedly preempted by the Foreign Affairs Doctrine. ..................50

    A.    The Notice can only be preempted by the supreme Law of the Land. ....................................................................52

    B.    Mere "executive statements" and "policy preferences" cannot preempt state action. ...............................................53

    C.    The Notice is not preempted by the Transit Treaty.............56

      1.    Enbridge had no standing or right of action to bring a Treaty claim....................................................57

      2.    The Notice does not violate the Transit Treaty. .........58

            a.      A clear statement is required to divest the State of ownership and control over sovereign lands................................................59

            b.      The Treaty does not include a clear statement stripping the State of its proprietary and sovereign rights........................61

    D.    None of the district court's other rationales show preemption. ....................................................................66

III.    The district court erred by unnecessarily deciding the constitutional preemption issues in this case. ............................68

Conclusion and Relief Requested...........................................................71

iv

Certificate of Compliance ..................................................................... 72

Certificate of Service ........................................................................... 74

Designation of Relevant District Court Documents ............................. 75

# TABLE OF AUTHORITIES

Page

**Cases**

*AFSCME Mich. Counsil 25 v. City of Detroit,*
704 N.W.2d 712 (Mich. 2005)......................................................49

*Airline Servs. Providers Ass'n v. Los Angeles World Airports,*
873 F.3d 1074 (9th Cir. 2017) .............................................37

*Allegheny County v. Frank Mashuda Co.,*
360 U.S. 185 (1959) .......................................................69

*Allen v. United States,*
83 F.4th 564 (6th Cir. 2023)........................................... 22, 45

*Allied Constr. Indus. v. City of Cincinnati,*
879 F.3d 215 (6th Cir. 2018) ..............................................38

*Altria Grp., Inc. v. Good,*
555 U.S. 70 (2008) ........................................................20

*Am. Ins. Ass'n v. Garamendi,*
539 U.S. 396 (2003) ....................................................50, 51

*Am. Trucking Ass'ns v. City of Los Angeles,*
569 U.S. 641 (2013) ..................................................39, 40, 44

*Armstrong v. Exceptional Child Ctr., Inc.,*
575 U.S. 320 (2015) ..................................................52, 57, 59

*Bad River Band of the Lake Superior Tribe of Chippewa Indians of
the Bad River Reservation v. Enbridge Energy Co.,*
No. 19-cv-602, 2022 WL 17249085 (W.D. Wis. Nov. 28, 2022) 58, 64, 65

*BellSouth Telecomms., Inc. v. Se. Tel., Inc.,*
462 F.3d 650 (6th Cir. 2006) ..............................................44

*BFP v. Resolution Trust Corp.,*
511 U.S. 531 (1994) ......................................................60

*Bond v. United States,*
572 U.S. 844 (2014) ....................................................................59

*Bowen v. Georgetown Univ. Hosp.,*
488 U.S. 204 (1988) ....................................................................43

*Building & Constr. Trades Council v. Associated Builders &*
*Contractors of Mass./R.I., Inc.,*
507 U.S. 218 (1993) ...............................................33, 36, 40

*Chamber of Commerce v. Whiting,*
563 U.S. 582 (2011) ....................................................................53

*Cisneros v. Alpine Ridge Grp.,*
508 U.S. 10 (1993) ......................................................................62

*Columbia Gas Transmission Corp. v. Drain,*
191 F.3d 552 (4th Cir. 1999) ......................................29, 37

*Counts v. Gen. Motors, LLC,*
139 F.4th 576 (6th Cir. 2025)................................................17

*Couser v. Shelby Cnty.,*
139 F.4th 664 (8th Cir. 2025)................................................30

*CSX Transp., Inc. v. Easterwood,*
507 U.S. 658 (1993) ....................................................................20

*Dan's City Used Cars, Inc. v. Pelkey,*
569 U.S. 251 (2013) ....................................................................20

*Dyball v. Lennox,*
680 N.W.2d 522 (Mich. Ct. App. 2004) ............................48

*Enbridge Energy LP v. Whitmer,*
135 F.4th 467 (6th Cir. 2025)..................................... passim

*Enbridge Energy, LP v. Nessel,*
146 S.Ct. 1074 (2026) .........................................10, 12, 13

*EPLET, LLC v. DTE Pontiac N., LLC,*
984 F.3d 493 (6th Cir. 2021) ................................................49

*Fenner v. Gen. Motors, LLC,*
113 F.4th 585 (6th Cir. 2024) .............................................................. 16

*Gingery v. City of Glendale,*
831 F.3d 1222 (9th Cir. 2016) ............................................................ 67

*Glass v. Goeckel,*
703 N.W.2d 58 (Mich. 2005) ............................................................ 5, 6

*Golden State Transit Corp. v. City of Los Angeles,*
475 U.S. 608 (1986) ........................................................................... 40

*Gregory v. Ashcroft,*
501 U.S. 452 (1991) ........................................................................... 29

*Idaho v. Coeur d'Alene Tribe of Ida.,*
521 U.S. 261 (1997) ............................................................... 25, 29, 60

*Ill. Cent. R.R. Co. v. Illinois,*
146 U.S. 387 (1892) ................................................................. 6, 25, 26

*In re Enbridge Energy, LP,*
964 N.W.2d 173 (Minn. Ct. App. 2021) ............................................ 24

*Kansas v. Garcia,*
589 U.S. 191 (2020) ....................................................... 20, 52, 53, 68

*Landgraf v. USI Film Prods.,*
511 U.S. 244 (1994) ............................................................... 43, 45, 48

*Light v. United States,*
220 U.S. 523 (1911) ........................................................................... 33

*Medellín v. Texas,*
552 U.S. 491 (2008) .................................................................. passim

*Medtronic, Inc. v. Lohr,*
518 U.S. 470 (1996) ........................................................................... 20

*Merrick v. Diageo Am. Supply, Inc.,*
805 F.3d 685 (6th Cir. 2015) ............................................................. 60

*Morrison v. Circuit City Stores, Inc.*,
  317 F.3d 646 (6th Cir. 2003) (en banc) ................................................ 49

*Mortensen v. Comm'r*,
  440 F.3d 375 (6th Cir. 2006) ........................................................ 47

*Murphy v. NCAA*,
  584 U.S. 453 (2018) ............................................................... 28

*Nedtweg v. Wallace*,
  208 N.W. 51 (Mich. 1926) ............................................................. 5

*New York v. United States*,
  505 U.S. 144 (1992) ........................................................... 27, 28

*Obrecht v. Nat'l Gypsum Co.*,
  105 N.W.2d 143 (Mich. 1960) ...................................................... 6, 26

*Olympic Pipe Line Co. v. City of Seattle*,
  437 F.3d 872 (9th Cir. 2006) ................................................. 38, 39, 40

*Oregon ex rel. State Land Bd. v. Corvallis Sand & Gravel Co.*,
  429 U.S. 363 (1977) ............................................................... 60

*PennEast Pipeline Co. v. New Jersey*,
  594 U.S. 482 (2021) ............................................................... 29

*Phillips Petrol. Co. v. Mississippi*,
  484 U.S. 469 (1988) (O'Connor, J., dissenting) ..................................... 32

*Portland Pipe Line Corp. v. City of S. Portland*,
  288 F. Supp. 3d 321 (D. Me. 2017) .................................................. 62

*PPL Montana, LLC v. Montana*,
  565 U.S. 576 (2012) ............................................................... 25

*Rapanos v. United States*,
  547 U.S. 715 (2006) (plurality op. of Scalia, J.) ................................... 60

*Reeves, Inc. v. Stake*,
  447 U.S. 429 (1980) ............................................................... 36

ix

*Republic of Austria v. Altmann*,
  541 U.S. 677 (2004) ........................................................... 43

*San Francisco v. EPA*,
  604 U.S. 334 (2025) ........................................................... 23

*SFPP, L.P. v. Union Pacific R.R. Co.*,
  274 F. App'x 549 (9th Cir. 2008) ........................................ 36

*SFPP, L.P. v. Union Pacific R.R. Co.*,
  No. 05-cv-1015, 2006 WL 8448721 (C.D. Cal. Mar. 20, 2006) . 35, 36, 47

*SFPP, L.P. v. Union Pacific R.R. Co.*,
  No. 05-cv-1015, 2006 WL 8448728 (C.D. Cal. Aug. 30, 2006) ............. 36

*Solid Waste Agency of N. Cook Cnty. v. Army Corps of Eng'rs*,
  531 U.S. 159 (2001) ........................................................... 60

*Sprint Spectrum L.P. v. Mills*,
  283 F.3d 404 (2d Cir. 2002) ............................................... 41

*Stokes v. Millen Roofing Co.*,
  649 N.W.2d 371 (Mich. 2002) ........................................... 50

*Superior Comm'cns v. City of Riverview*,
  881 F.3d 432 (6th Cir. 2018) ......................................... 39, 41

*Texas v. U.S. Dep't of Homeland Security*,
  123 F.4th 186 (5th Cir. 2024) ........................................... 55

*Torres v. Precision Indus., Inc.*,
  938 F.3d 752 (6th Cir. 2019) ...................................... 17, 68, 69

*Tyrrell v. Norfolk S. Ry. Co.*,
  248 F.3d 517 (6th Cir. 2001) ............................................. 20

*U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*,
  590 U.S. 604 (2020) ...................................................... 28, 59

*United States v. Emuegbunam*,
  268 F.3d 377 (6th Cir. 2001) ......................................... 57, 59

x

*United States v. Rife,*
33 F.4th 838 (6th Cir. 2022)...........................................................52, 53

*Utah Div. of State Lands v. United States,*
482 U.S. 193 (1987) ............................................................................60

*Vill. of Pine Run v. S. Jersey Gas Co.,*
520 A.2d 1367 (N.J. Super. Ct. App. Div. 1987) ................................23

*Virginia Uranium v. Warren,*
587 U.S. 761 (2019) (lead op. of Gorsuch, J.)...............................52, 66

## Statutes

15 U.S.C. §717f(h) .............................................................................29

28 U.S.C. §1291 ...................................................................................1

28 U.S.C. §1331 ...................................................................................1

49 U.S.C. §60101 *et seq.* .....................................................................3

49 U.S.C. §60101(a)(17)......................................................................37

49 U.S.C. §60102(a)(2).................................................................. 28, 34

49 U.S.C. §60102(a)(2)(A)...................................................................28

49 U.S.C. §60102(a)(2)(B)............................................................. 24, 28

49 U.S.C. §60102(b)(4)........................................................................24

49 U.S.C. §60104(b) ...........................................................................45

49 U.S.C. §60104(c) ..................................................................... passim

49 U.S.C. §60104(e) ..................................................................... passim

49 U.S.C. §60105(b)(1)........................................................................38

49 U.S.C. §60115 .................................................................................24

49 U.S.C. §60120(c) ...................................................................... 45, 47

49 U.S.C. §60120(d) ..............................................................48

49 U.S.C. §60121(d) ..............................................................45

**Other Authorities**

Agreement Concerning Transit Pipelines,
Can.-U.S., Jan. 28, 1977, 28 U.S.T. 7449 ............................................13

Black's Law Dictionary (12th ed. 2024) ...................................... 38, 44, 63

*Est. of Min. Safety Stds.*,
35 Fed. Reg. 13,248 (Aug. 19, 1970)............................................. 23, 34

H.R. Rep. No. 102-247 (1991)...............................................................24

H.R. Rep. No. 103-180 (1993)...............................................................38

H.R. Rep. No. 90-1390 (1968)............................................... 23, 31, 37, 46

Ltr. from Jeffrey D. Wiese, Assoc. Admin. for Pipeline Safety,
PHMSA, to Russell K. Girling, Pres., TransCanada Corp.,
*Role of U.S. Local Governments in Pipeline Safety* (May 28,
2014), https://pstrust.org/wp-content/uploads/2014/05/PHMSA-
Letter-to-TransCanada-on-Role-of-Local-Governments-in-
Pipeline-Safety.pdf ....................................................................... 22, 35

Michael R. Ramsey, *International Wrongs, State Laws and
Presidential Policies*,
32 Loy. L.A. Int'l & Comp. L. Rev. 19 (2011).......................................55

PIPA Recommended Practice BL07,
https://primis.phmsa.dot.gov/stakeholder-comms/pipa/pipa-
practice-bl07/ .....................................................................................35

Pipeline Safety Trust (PST), *Local Government Guide to Pipelines,*
§4.3 (1st ed. 2014),
https://pstrust.org/wp-content/uploads/2013/10/PST-Govt-Guide-
Pipelines-2014-web.pdf ................................................................ 24, 31

*Presidential Permit*,
  https://www.whitehouse.gov/presidential-
  actions/2026/04/presidential-permit-authorizing-enbridge-
  energy-company-inc-to-operate-and-maintain-existing-pipeline-
  facilities-at-st-clair-county-michigan-at-the-international-
  boundary-between-the-united-stat/ (Apr. 15, 2026) ...........................65

Press Release, *Attorney General Nessel Lauds "Game-changing"*
  *Line 5 Report*,
  https://www.michigan.gov/ag/news/press-
  releases/2023/11/17/attorney-general-nessel-lauds-game-
  changing-line-5-report (Nov. 17, 2023) ..............................................67

Press Release, *Governor Whitmer Takes Action to Protect the Great*
  *Lakes*,
  https://www.michigan.gov/whitmer/news/press-
  releases/2021/11/30/governor-whitmer-takes-action-to-protect-
  the-great-lakes (Nov. 30, 2021) ...........................................................13

Pub. L. 96-129, 93 Stat. 1003, §203 (Nov. 30, 1979)...............................37

Pub. L. No. 90-481, 82 Stat. 720, §3(b) (Aug. 12, 1968).........................23

Rafael G. Mora, et al.,
  *Pipeline Integrity Management Systems:  A Practical Approach*
  §2.6.1 (ASME Press 2016)....................................................................21

Sasha Yusufali & Larry R. Pratt, *Petro-Canada*,
  https://thecanadianencyclopedia.ca/en/article/petro-canada...............61

Seattle Mun. Code. 15.32.010 ..................................................................39

Taylor C. Noakes, *Oil and Gas Policy in Canada*, 1947-80,
  https://thecanadianencyclopedia.ca/en/article/oil-and-gas-policy-
  in-canada-1947-80................................................................................61

Treaty, art. II(1), 28 U.S.T. 7449 ....................................................... 62, 63

Treaty, art. II(3), 28 U.S.T. 7449 .............................................................64

Treaty, art. II, 28 U.S.T. 7449...................................................................63

xiii

Treaty, art. IV, 28 U.S.T. 7449 ........................................................ 62, 63

Treaty, art. IX, 28 U.S.T. 7449 .............................................................58

U.S. Army Corps of Eng'rs, *Line 5 Tunnel Project Final Environmental Impact Statement*, https://www.line5tunneleis.com/wp-content/uploads/2026/02/Enbridge-Line-5-Tunnel-Project_Final-Environmental-Impact-Statement_Volume-2-Appendix_508.pdf ........9

U.S. Dep't of State, Office of the Historian, *Oil Embargo, 1973-1974*, https://history.state.gov/milestones/1969-1976/oil-embargo ...............61

William S. Dodge, *DOJ Takes Broad View of Foreign Affairs Preemption in Pipeline Case*, Transnat'l Litig. Blog, https://tlblog.org/doj-takes-broad-view-of-foreign-affairs-preemption-in-pipeline-case/ (Oct. 1, 2025) ..........................................56

William S. Dodge, *We Still Don't Know What the State Department Thinks About the Transit Pipelines Treaty*, https://tlblog.org/we-still-dont-know-what-the-state-department-thinks-about-the-transit-pipelines-treaty/ (Apr. 11, 2024) ........... 14, 64

William S. Dodge, *What Does the State Department Think About the Transit Pipelines Treaty?*, https://tlblog.org/what-does-the-state-department-think-about-the-transit-pipelines-treaty/ (Feb. 15, 2024) ................................. 13, 64

## Rules

Fed. R. Civ. P. 25(d).............................................................................11

## Regulations

18 C.F.R. Part 380...............................................................................31

49 C.F.R. §1.97(a)(1)............................................................................21

49 C.F.R. §192.327(e) ..........................................................................46

## Constitutional Provisions

U.S. Const. Art. I, §7 ..............................................................52

U.S. Const. Art. VI, cl.2..........................................................52

Case: 26-1021   Document: 13   Filed: 05/04/2026   Page: 17

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Defendants-Appellants Michigan Governor Gretchen Whitmer and Michigan Department of Natural Resources (MDNR) Director Scott Bowen (collectively, State Officials) respectfully request oral argument. The opinion below divests the State of Michigan of its proprietary and sovereign rights in state-owned, submerged lands based on novel applications of the Pipeline Safety Act and the Foreign Affairs Doctrine. The statutory and constitutional grounds on which the opinion rests are issues of first impression in this Circuit.

The procedural history of this case is also complex, involving three different lawsuits regarding Plaintiffs-Appellants' (collectively, Enbridge) use of Michigan's land, and related proceedings before multiple courts and administrative bodies. The relationship between those lawsuits implicates considerations of comity and federalism, as well as the district court's obligation to avoid unnecessarily deciding constitutional questions where an earlier-filed, parallel action may render them moot.

Accordingly, oral argument will assist this Court in reaching a full understanding of the issues presented and the underlying facts.

xvi

# JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §1331. Enbridge sued the State Officials for alleged violations of federal law. (Am. Compl., R.158, PageID.2343-48.) This Court held that state sovereign immunity does not apply. *Enbridge Energy LP v. Whitmer*, 135 F.4th 467, 479-80 (6th Cir. 2025).

On December 17, 2025, the district court entered a final order granting Enbridge's motion for summary judgment. (Op., R.164, PageID.2461-2505; Jmt., R.165, PageID.2506.) The State Officials timely filed their Notice of Appeal on January 6, 2026. (R.166, PageID.2507.) This Court has jurisdiction under 28 U.S.C. §1291.

## STATEMENT OF ISSUES PRESENTED

Enbridge occupies a four-mile stretch of the State of Michigan's submerged lands under an easement granted by the State in 1953. On November 13, 2020, the State Officials notified Enbridge that the State was terminating the easement for breach of its essential terms, and, alternatively, revoking it as invalidly conveyed under the public-trust doctrine. Enbridge responded by suing the State Officials in federal court, alleging the State's Notice of Revocation and Termination of Easement was expressly preempted by the Pipeline Safety Act and impliedly preempted by the Foreign Affairs Doctrine.

The questions presented are:

1. Is the Notice of Revocation and Termination expressly preempted by the Pipeline Safety Act?

2. Is the Notice of Revocation and Termination impliedly preempted by the Foreign Affairs Doctrine?

3. Did the district court err by unnecessarily deciding Enbridge's constitutional claims?

## INTRODUCTION

This appeal arises from a federal preemption ruling of staggering breadth. The State, exercising its right as landowner, terminated an easement in state land because Enbridge repeatedly breached its terms. The State also revoked the easement because it was invalidly conveyed in violation of state law. The district court held that the State cannot terminate or revoke the easement and must endure the ongoing physical occupation of state land without its consent.

In the district court's view, it does not matter whether Enbridge has any valid property rights: Congress forced states, having once granted permission to use state land, to forever surrender their rights in that land regardless of whether the occupier complied with the terms under which the state granted access—an endless, congressionally compelled occupation. No law remotely supports that outcome.

*First*, the Pipeline Safety Act, 49 U.S.C. §60101 *et seq.*, governs the enactment of pipeline "safety standards." But it says *nothing* about property rights. Pipelines must be located on valid easements and confined to the easement's terms. Had Congress intended to upend this bedrock *state* law, it would have said so.

3

*Second*, the Foreign Affairs Doctrine is not a roving power to divest a state of proprietary and sovereign rights based on mere executive statements or policy preferences. The only federal *law* that Enbridge cited—a 1977 Transit Treaty—*preserves* generally applicable property requirements. And consistent foreign policy over multiple administrations demonstrates that international pipelines must be sited on valid easements just like any other.

*Third*, almost as troubling as the district court's flawed merits analysis is its decision to weigh in at all. Enbridge's right to use the State's land is being litigated in an earlier-filed, parallel suit, which may render the issues presented here moot. The State Officials have not sought to enforce the easement's termination in five years, preferring to await the parties' rights to be adjudicated in that suit. Principles of constitutional avoidance, comity, and federalism required judicial restraint.

This Court should either reverse the district court's merits rulings or vacate and remand with instructions to enter a stay pending the parallel litigation.

## STATEMENT OF THE CASE

### A.    The State of Michigan's ownership of the submerged lands beneath the Straits of Mackinac

When Michigan entered the Union in 1837, it acquired ownership of the land beneath the Straits of Mackinac, which link Lakes Michigan and Huron and separate Michigan's Upper and Lower Peninsulas. *See Nedtweg v. Wallace*, 208 N.W. 51, 52 (Mich. 1926). The State's ownership of submerged lands is two-fold: the State has both "proprietary title and obligations of sovereignty." *Id.*

As proprietor, the State holds the "right, title, [and] dominion of private ownership," *Glass v. Goeckel*, 703 N.W.2d 58, 66 n.10 (Mich. 2005), and "has an undoubted right to make use of its proprietary interest," for example, by leasing submerged lands, *Nedtweg*, 208 N.W. at 52-53. As sovereign, the State has an obligation "to protect and preserve the waters of the Great Lakes and the lands beneath them for the public." *Glass*, 703 N.W. 2d at 64. "The state serves, in effect, as the trustee of public rights in the Great Lakes." *Id.,* 64-65.

The State's public-trust obligation limits its proprietary right to convey submerged lands. Before doing so, the State must make a "due finding" in "recorded form" that the conveyance will (1) improve the

5

public trust; or (2) not impair the public's rights in the land and water. *Obrecht v. Nat'l Gypsum Co.*, 105 N.W.2d 143, 149 (Mich. 1960) (citing *Ill. Cent. R.R. Co. v. Illinois*, 146 U.S. 387, 455-56 (1892)).  Public rights continue to exist even after an interest in the land is sold, so the State "necessarily conveys such property *subject to the public trust.*"  *Glass*, 703 N.W.2d at 65 (emphasis in original).

### B.    The 1953 easement contract

In 1953, the State of Michigan, as Grantor, and Enbridge, as Grantee, entered into a contract purporting to "convey[] and quit claim[]" an easement for Enbridge "to construct, lay, maintain, use and operate two (2) pipe lines" on a four-mile stretch of submerged lands in the Straits.[1]  (Easement, R.158, PageID.2373-85.)  The State sold the easement "for and in consideration of" a one-time payment of $2,450 and "for and in consideration of the undertakings of Grantee and subject to the terms and conditions set forth" in the easement contract. (*Id.,* PageID.2374.)

---

[1] The easement was granted to Enbridge's predecessor, the Lakehead Pipeline Company.  For ease and consistency with this Court's prior opinion, this brief treats the original easement as between the State and Enbridge.  *See Enbridge*, 135 F.4th at 471 n.2.

Enbridge agreed to:  exercise "due care of a reasonably prudent person"; "comply with all laws of the State of Michigan and of the Federal government"; and "comply with [certain] minimum specifications, conditions and requirements."  (*Id.,* PageID.2375-76, ¶A.) As relevant here, those conditions require that:  the minimum curvature of any section of pipe shall be no less than 2,050 feet radius; all pipe shall be protected by a specified coating and wrap; and the maximum span of unsupported pipe shall not exceed 75 feet.  (*Id.,* PageID.2377, ¶¶A(4), A(9)-(10).)

Michigan granted the 1953 easement "until terminated as hereinafter provided."  (*Id.,* PageID.2375.)  The easement "may be terminated … [i]f, after being notified in writing by Grantor of any specified breach of the terms and conditions of this easement, Grantee shall fail to correct said breach within ninety (90) days."  (*Id.,* PageID.2379, ¶C(1).)  Upon termination, "Grantee shall take all of the usual, necessary, and proper abandonment procedures as required and approved by Grantor."  (*Id.,* PageID.2381, ¶H.)  "All rights not specifically conveyed … are reserved to the State of Michigan."  (*Id.,* PageID.2383, ¶M.)

7

## C.   The Straits Pipelines and proposed tunnel project

Under the 1953 easement, Enbridge constructed two oil pipelines in the Straits of Mackinac.  (Jnt. Stmt. of Material Facts, R.67, PageID.388.)  These "Straits Pipelines" became part of Enbridge's larger "Line 5" pipeline, which runs from Superior, Wisconsin, across Michigan, to Sarnia, Ontario.[2]  (*Id.*)  The Straits Pipelines are largely located on or above the lakebed, exposed in open water.  (Notice, R.158, PageID.2356-60.)  They lie in waters with strong currents and busy shipping lanes, and they have been struck and significantly damaged twice in recent years.  (*Id.*)

To address these issues, Enbridge proposes to replace the Straits Pipelines with a new pipeline in a four-mile tunnel bored beneath the Straits.  (*See id.,* PageID.2360-62.)  MDNR has issued a separate easement for the tunnel and replacement pipeline.  (11/12/25 Tr., R.160, PageID.2436.)  The project is in the permitting stage, with multiple applications currently pending or being challenged.  (*Id.,* PageID.2404-06.)  If all permits issue and all challenges resolve in Enbridge's favor,

---

[2] Enbridge's complaint contains many disputed factual allegations regarding Line 5, but they are not material to this appeal.  (*See* Ans., R.110, PageID.1048-83.)

8

the U.S. Army Corps of Engineers estimates that construction will take five to six years.[3]  Meanwhile, Enbridge and the State are engaged in this dispute regarding the existing pipelines.

### D.    The Attorney General's lawsuit

On June 27, 2019, Michigan Attorney General Dana Nessel filed a complaint in Michigan state court seeking to enjoin use of the Straits Pipelines on four grounds.  (AG's Compl., R.121-3, PageID.1155-96.) Count I.A alleges the 1953 easement was void from its inception because the State granted it without making either of the "due findings" required under the public trust doctrine.  (*Id.,* PageID.1162-65.)  Count I.B alleges that "even assuming the 1953 Easement was initially valid," it should be revoked because the continued operation of the Straits Pipelines poses a substantial risk of impairing public rights.  (*Id.,* PageID.1166-79.)  Count II alleges the Straits Pipelines are a public

---

[3] U.S. Army Corps of Eng'rs, *Line 5 Tunnel Project Final Environmental Impact Statement*, App'x F, p. F-11, https://www.line5tunneleis.com/wp-content/uploads/2026/02/Enbridge-Line-5-Tunnel-Project_Final-Environmental-Impact-Statement_Volume-2-Appendix_508.pdf (last visited May 4, 2026).

nuisance.  (*Id.,* PageID.1180.)  Count III alleges the Straits Pipelines violate the Michigan Environmental Protection Act.  (*Id.,* PageID.1181.)

Enbridge moved to dismiss on several state-law grounds and on grounds of federal preemption under the Pipeline Safety Act (PSA) and Foreign Affairs Doctrine.  (9/16/19 Mot., R.121-4, PageID.1198-1254; 1/27/25 Tr., R.121-8, PageID.1383.)  These issues have been extensively litigated in *Nessel,* including through two rounds of briefing and two oral arguments, each lasting several hours.  (Dkt., R.121-2, PageID.1143-53; 5/22/20 Tr., R.121-5, PageID.1255-1362; 1/27/25 Tr., R.121-8, PageID.1376-1554.)  They have not yet been decided due to procedural delays associated with Enbridge's belated effort to remove the case.  *See Enbridge Energy, LP v. Nessel,* 146 S.Ct. 1074, 1080-81 (2026).  On April 22, 2026, the U.S. Supreme Court unanimously rejected that effort and affirmed this Court's ruling that *Nessel* belongs in state court, where the motions remain pending.  *Id.,* 1086.

### E.    Notice of Revocation and Termination of Easement

The same day *Nessel* was filed, Governor Whitmer directed MDNR to comprehensively assess Enbridge's compliance with the 1953 easement.  (Notice, R.158, PageID.2353.)  Following that review, the

State terminated and revoked the easement. (*Id.*) The State Officials communicated the decision to Enbridge through a Notice of Revocation and Termination of Easement (Notice) dated November 13, 2020.[4] (*Id.,* PageID.2352-85.)

The Notice describes two distinct actions. Section I, "Revocation of Easement Pursuant to the Public Trust Doctrine," informed Enbridge that the State was "revoking the Easement pursuant to the public trust doctrine." (*Id.*, PageID.2353.) Sections I.B and I.C parallel Counts I.A. and I.B of the *Nessel* complaint and provide the substantive grounds for revocation: Section I.B covers the lack of "due findings" voiding the 1953 easement and §I.C states that continued use of the Straits Pipelines violates the public trust. (*Id.,* PageID.2353-60.)

Section II, "Termination of Easement for Violation and Breach by Enbridge," informed Enbridge that the State was invoking the termination clause of the 1953 contract. (*Id.,* PageID.2362-70.) Section II.B provides the grounds for termination: MDNR's finding that Enbridge had repeatedly breached the easement's terms over many

---

[4] The Notice was signed by former MDNR Director Daniel Eichenger. (Notice, R.158, PageID.2371.) The current Director, Scott Bowen, was substituted as defendant under Fed. R. Civ. P. 25(d).

years, including the due-care provision (¶A), curvature requirement (¶A(4)), coating requirement (¶A(9)), and maximum-span limit (¶A(10)). (*Id.,* PageID.2353, 2362-70.)

The State delayed the effective date of the revocation and termination by 180 days to give affected parties time to adjust. (*Id.,* PageID.2371.) At the end of that period, Enbridge was required to cease using the Straits Pipelines and decommission them, as required under the easement contract. (*Id.*) The Notice is an exercise of state property rights, not an executive order, and it is not enforceable by civil penalties, fines, or criminal sanctions.

### F.    The Governor's lawsuit

Anticipating that Enbridge would not voluntarily comply with the Notice, Governor Whitmer filed a complaint in Michigan state court seeking a declaration that the 1953 easement was properly revoked and terminated, and an injunction compelling Enbridge to vacate the State's land.[5] (Compl., W.D. Mich. Case No. 1:20-cv-1142, R.1-1.)

---

[5] The suit was brought by the State, the Governor, and MDNR. This brief refers to it as "the Governor's case" for ease and consistency with the Court's prior opinions. *See Nessel,* 104 F.4th at 962; *Whitmer,* 135 F.4th at 471-72.

Enbridge removed the Governor's suit—but not the Attorney General's suit—to federal court. *Nessel*, 146 S.Ct. at 1080. After the district court denied the Governor's motion to remand, the Governor voluntarily dismissed her case to clear the way for the validity of the 1953 easement to be decided in the Attorney General's earlier-filed suit. *See id.,* 1081.[6] The State Officials have not sought to enforce the Notice since that dismissal in late 2021.

### G.    U.S.-Canada dispute resolution

On October 4, 2021, Canada invoked the dispute-resolution provision in a 1977 Transit Treaty with the United States.[7] (Stmt., R.133-1, PageID.1742.) Canada alleged that any interference with the continued use of the Straits Pipelines would violate the Treaty. (R.133, PageID.1715.) The United States has not taken a public position.[8]

---

[6] Press Release, *Governor Whitmer Takes Action to Protect the Great Lakes*, https://www.michigan.gov/whitmer/news/press-releases/2021/11/30/governor-whitmer-takes-action-to-protect-the-great-lakes (Nov. 30, 2021).

[7] Agreement Concerning Transit Pipelines, Can.-U.S., Jan. 28, 1977, 28 U.S.T. 7449 (Transit Treaty or Treaty).

[8] *See* William S. Dodge, *What Does the State Department Think About the Transit Pipelines Treaty?*, https://tlblog.org/what-does-the-state-department-think-about-the-transit-pipelines-treaty/ (Feb. 15, 2024); William S. Dodge, *We Still Don't Know What the State Department*

Both countries urged the district court not to address the issue when Enbridge raised it below. (Can. Br., R.133, PageID.1730; U.S. Br., R.140, PageID.2037-38.)

### H.    This lawsuit

Enbridge filed this action on November 24, 2020. (Compl., R.1, PageID.1-55.) The amended complaint seeks declaratory and injunctive relief on two counts.[9] Count I alleges the Notice is expressly preempted by the PSA. (Am. Compl., R.158, PageID.2343-46.) Count III alleges the Notice is preempted by the Foreign Affairs Doctrine. (*Id.,* PageID.2346-48.)

On July 5, 2024, the district court denied the State Officials' motion to dismiss on state sovereign immunity grounds. (Op., R.94, PageID.940.) This Court affirmed. *Whitmer*, 135 F.4th at 479-80. The panel *sua sponte* raised whether abstention was warranted given the

---

*Thinks About the Transit Pipelines Treaty*, https://tlblog.org/we-still-dont-know-what-the-state-department-thinks-about-the-transit-pipelines-treaty/ (Apr. 11, 2024).

[9] Count II of the original complaint alleged a violation of the dormant commerce clause. (Compl., R.1, PageID.13-16.) That claim was voluntarily dismissed with prejudice. (Order, R.157, PageID.2332.)

14

parallel litigation in *Nessel*, but concluded it lacked jurisdiction to address the issue and left it to be decided on remand. *Id.,* 472 n.3.

## I.    The opinion below

On August 1, 2025, the State Officials filed a motion asking the district court to abstain or stay pending a decision in the earlier-filed *Nessel* suit, arguing that principles of comity, federalism, and wise judicial administration required a stay, especially since it was not "absolutely necessary" to decide the preemption issues, which might be "mooted entirely" by a decision in *Nessel*. (Defs' 8/1/25 Mot., R.120, PageID.1116; 11/12/25 Tr., R.160, PageID.2441.)

At the same time, Enbridge moved for summary judgment on two grounds:  "express preemption under the Pipeline Safety Act (Count I) and preemption under the 1977 Transit Treaty Pipeline [*sic*] and the Foreign Affairs Doctrine (Count III)." (Pls' 8/1/25 Mot., R.124, PageID.1562-63; Pls' 8/6/25 Br., R.128, PageID.1612.)  On December 17, 2025, the district court denied the State Officials' motion and granted Enbridge's.  (Op., R.164, PageID.2461-2505.)

15

**J.      This appeal**

The State Officials challenge three aspects of the opinion below. *First*, the district court erred by finding the PSA expressly preempts the State from (a) revoking the easement as "void from inception" under the public-trust doctrine (*id.,* PageID.2489-90); and (b) terminating it for breach.  (*Id.,* PageID.2485-87.)  *Second*, the district court erred by finding the Notice impliedly preempted under the Foreign Affairs Doctrine.  (*Id.,* PageID.2493-99.)  *Third*, the district court erred by unnecessarily deciding the constitutional questions raised here.  (*Id.,* PageID.2500-04.)

## STANDARD OF REVIEW

This Court reviews de novo a district court's grant of summary judgment on preemption grounds.  *Fenner v. Gen. Motors, LLC*, 113 F.4th 585, 593 (6th Cir. 2024).  The Court "must view the facts and draw reasonable inferences in the light most favorable to the nonmoving party," and "will affirm … only when the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *Id.* (cleaned up).  As the party asserting preemption, Enbridge bears the burden of proof.  *Counts v.*

*Gen. Motors, LLC*, 139 F.4th 576, 581 (6th Cir. 2025). Constitutional avoidance is a legal issue reviewed de novo. *Torres v. Precision Indus., Inc.*, 938 F.3d 752, 754 (6th Cir. 2019).

## SUMMARY OF ARGUMENT

The district court's sweeping ruling upends the balance between federal and state power over state territory, stripping the State of its proprietary rights as landowner, its bargained-for contract rights, and its sovereign role in managing submerged lands. The opinion below must be reversed or vacated for four reasons:

*First*, the PSA neither precludes the State from making "due findings" regarding the public trust before conveying submerged lands nor preempts the State from revoking a conveyance when that obligation is not fulfilled. The "due findings" requirement is a sovereign obligation that applies *to the State* as trustee of public rights in the Great Lakes. It is not a "safety standard" regulating private conduct. The district court's holding that the PSA preempts an internal rule of self-governance and divests the State of its sovereign role violates basic federalism principles and finds no support in the PSA.

17

*Second*, the PSA does not prohibit the State from exercising its contractual right to terminate an easement for breach.  As landowner, the State may manage its property in the same manner as private landowners, who routinely include safety-related terms in pipeline easements.  And here, the State bargained for its easement rights 26 years before the PSA's predecessor was enacted.  The district court's declaration that later-enacted law nullified those bargained-for terms violates antiretroactivity principles and improperly divests the State of contract rights.  Moreover, if the easement's essential terms are unenforceable, the entire contract fails, and Enbridge has no right to occupy the State's land.

*Third*, the district court's ruling that the Notice is impliedly preempted under the Foreign Affairs Doctrine transgresses limits the Framers purpose-built into the Constitution.  Rather than analyzing the terms of any law with preemptive force under the Supremacy Clause, the district court relied on (1) statements in amicus briefs, (2) a policy supposedly "embodied" in a Treaty the court purported not to interpret, and (3) its view that Michigan's management of its own land is not an area of traditional state responsibility and unsubstantiated

fears of speculative economic harm.  None of that can abrogate the State's proprietary and sovereign rights.  Preemption by judicial policy preference or brooding federal interest is not enough.

*Fourth*, the district court erred by unnecessarily adjudicating Enbridge's constitutional claims.  The State Officials withdrew their suit so the validity of the 1953 easement could be determined in the earlier-filed *Nessel* action.  A decision there may render the questions raised here moot.  Under established principles of judicial restraint, the district court erred by weighing in.

## ARGUMENT

### I.    The district court erred by holding that the Notice is expressly preempted by the Pipeline Safety Act.

The Pipeline Safety Act's (PSA) express preemption provision states in part:  "A State authority may not adopt or continue in force safety standards for interstate pipeline facilities or interstate pipeline transportation."  49 U.S.C. §60104(c).  The district court held that this language preempts the State from (1) revoking the 1953 easement as "void from inception" under the public trust doctrine; or (2) terminating the 1953 easement for breach.  Neither holding withstands scrutiny.

19

## A.     Legal standard

Under the Supremacy Clause, "a federal statute may expressly preempt state law." *Kansas v. Garcia*, 589 U.S. 191, 202 (2020).  In such cases, the Court's "task is to identify the domain expressly pre-empted." *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 260 (2013) (cleaned up).  The Court "must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993).

"[I]nterpretation of that language does not occur in a contextual vacuum." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996).  A court must examine the clause's language, surrounding statutory structure, and regulatory scheme, and "how Congress intended to affect business, consumers, and the law through these combined factors." *Tyrrell v. Norfolk S. Ry. Co.*, 248 F.3d 517, 522 (6th Cir. 2001) (cleaned up).  When a clause "is susceptible of more than one plausible reading, courts ordinarily accept the reading that disfavors pre-emption." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008) (cleaned up).

## B.    The PSA does not govern pipeline location or land rights.

This dispute centers on the reach of the PSA's ban on adopting state "safety standards" for interstate pipelines.  While the term "safety standard" is not defined in the PSA, "standards" are generally "a set of technical definitions and guidelines that function as instructions for designers, manufacturers, operators or users of equipment."[10]  Read in context, the "safety standards" prohibition should be understood to bar state agencies from *regulating how* interstate pipelines are operated.  The provision does not restrict states from exercising *property rights* or determining pipeline placement.

The PSA does not forbid states from *considering* pipeline safety when managing their property, as the district court supposed.  To the contrary, the Pipeline and Hazardous Materials Safety Administration (PHMSA),[11] the agency that administers the PSA, "believes that pipeline safety is a responsibility shared by all three levels of

---

[10] Rafael G. Mora, *et al.*, *Pipeline Integrity Management Systems:  A Practical Approach* §2.6.1 (ASME Press 2016), R.134-1, PageID.1806.

[11] PHMSA is the agency within the Department of Transportation (DOT) with delegated authority to administer the PSA.  49 C.F.R. §1.97(a)(1).  For ease, this brief refers to DOT as PHMSA.

21

government—federal, state, and local—as well as by pipeline operators, excavators, and property owners."[12]

The work is split like this:  PHMSA "sets standards for the design, construction, operation and maintenance" of interstate oil pipelines.[13] Meanwhile, state and local governments "have traditionally exercised broad powers to regulate land use and property development," and "[n]othing in Federal law impinges on these traditional prerogatives."[14] Under this framework, interstate pipeline operators answer to the federal government for pipeline safety regulation and look to the states for issues within traditional state control (such as property rights).

This division of responsibility is reflected in the "overall statutory scheme," *Allen v. United States*, 83 F.4th 564, 568-69 (6th Cir. 2023), which has developed over time, *cf. San Francisco v. EPA*, 604 U.S. 334,

---

[12] Ltr. from Jeffrey D. Wiese, Assoc. Admin. for Pipeline Safety, PHMSA, to Russell K. Girling, Pres., TransCanada Corp., *Role of U.S. Local Governments in Pipeline Safety* (May 28, 2014), https://pstrust.org/wp-content/uploads/2014/05/PHMSA-Letter-to-TransCanada-on-Role-of-Local-Governments-in-Pipeline-Safety.pdf.

[13] *Id.*

[14] *Id.*

348 (2025) (reviewing "the history of federal water pollution legislation" to aid in statutory interpretation).

Before the PSA, pipeline safety was a matter of industry self-governance and state tort law.  Then, "a number, but far from all, of the States" began to "prescrib[e] pipeline safety standards by legislative or State commission action."  H.R. Rep. No. 90-1390, 13 (1968).  State standards varied, as did the authority and enforcement powers of the state "commissions" and "regulatory bodies."  *Id.,* 14-15.

In 1968, Congress directed PHMSA to "establish *minimum* Federal safety standards for the transportation of gas and pipeline facilities."  Pub. L. No. 90-481, 82 Stat. 720, §3(b) (Aug. 12, 1968) (emphasis added).  When PHMSA adopted the first federal standards in 1970, it recognized that it set the floor, not the ceiling:  "With respect to interstate facilities under Federal jurisdiction, an operator may voluntarily exceed these standards."  *Est. of Min. Safety Stds.*, 35 Fed. Reg. 13,248, 13,250 (Aug. 19, 1970); *see also Vill. of Pine Run v. S. Jersey Gas Co.*, 520 A.2d 1367, 1367 (N.J. Super. Ct. App. Div. 1987).  PHMSA's regulations govern only certain pipeline operations, 49 U.S.C.

23

§60102(a)(2)(B), and can be adopted only following technical review, *id.* §§60102(b)(4), 60115.

The PSA specifically places "the location and routing of a pipeline" outside of PHMSA's jurisdiction.  49 U.S.C. §60104(e).  *Where* a pipeline is located is initially determined by the pipeline company, which plans a proposed route and then must secure government approval and the necessary property rights.[15]

PHMSA plays no role in either decision.  For oil pipelines, states approve the proposed route—they can and do consider environmental factors in doing so.  *See* PST, n.15 above, §4.3; *In re Enbridge Energy, LP*, 964 N.W.2d 173, 204 (Minn. Ct. App. 2021).  And the necessary property rights are sought from landowners, who *of course* consider safety when allowing an oil pipeline on their land.  In sum, interstate oil pipelines are "subject to the routing *and environmental assessment requirements* of the individual states they traverse."  H.R. Rep. No. 102-247, pt.1, 14 (1991) (emphasis added).

---

[15] *See* Pipeline Safety Trust (PST), *Local Government Guide to Pipelines,* §4.3 (1st ed. 2014), https://pstrust.org/wp-content/uploads/2013/10/PST-Govt-Guide-Pipelines-2014-web.pdf (last visited May 4, 2026).

As PHMSA recognizes, the PSA reserved a significant role for states and landowners in pipeline safety.  States retain the right to determine appropriate pipeline location.  And to the extent the state owns the required land, absolutely nothing in the PSA indicates an intent to strip the state of its right to manage that land.

**C.    Section I.B of the Notice is not preempted because the State's obligation to make "due findings" when granting easements is not a pipeline safety standard.**

"The public trust doctrine is of ancient origin."  *PPL Montana, LLC v. Montana*, 565 U.S. 576, 604 (2012).  It stems from the "unique status" of submerged lands, which are "infused with a public trust the State itself is bound to respect."  *Idaho v. Coeur d'Alene Tribe of Ida.*, 521 U.S. 261, 283 (1997).  As trustee, the State faces restrictions on its ability to dispose of the land.

A prominent illustration is *Illinois Central*, where Illinois conveyed navigable waters of Lake Michigan to a private party.  Years later, the state revoked the conveyance.  146 U.S. 454-55.  The Supreme Court upheld the revocation, holding that submerged lands can only be alienated if the state duly considers the public trust.  *Id.*  Because the

25

initial grant was made "in disregard of" the state's duty as trustee, it was "necessarily revocable." *Id.,* 454, 460.

Michigan "[l]ong ago" embraced "the universally accepted rules of such trusteeship" announced in *Illinois Central. Obrecht*, 105 N.W.2d at 149. To govern its administration of the trust, the State has adopted a rule: "[N]o part of the beds of the Great Lakes … can be alienated or otherwise devoted to private use in the absence of due finding" that there are "exceptional reasons for such alienation or devotion to nonpublic use." *Id.* A conveyance of submerged lands without those "due findings" is invalid.

In Section I.B of the Notice, the State revoked the 1953 easement as "void from its inception" since the state officials who conveyed it to Enbridge did not make the required findings. (Notice, R.158, PageID.2353-56.) The district court expressed skepticism about that conclusion. (Op., R.164, PageID.2490 n.10.) But it held that, even if the requirement was violated, it made no difference. In its view, revoking the easement for want of due findings "operates as a safety standard: Michigan officials would have to review whether the pipeline poses a

26

safety risk to the environment." (*Id.,* PageID.2490.)  Thus, the court held, the revocation was expressly preempted under §60104(c).

The district court's holding is wrong for three related reasons. *First*, the due-findings requirement regulates the conduct of the State, not Enbridge.  As a rule of internal self-regulation, it falls outside the PSA's preemptive scope.  *Second*, the due-findings requirement is not a pipeline regulation.  It governs only whether a state-law property interest was validly conveyed.  *Third*, while the State must *consider* safety to make the necessary findings, the PSA does not preempt safety considerations.  Nor does it preclude states from correcting past errors when the public trust was *not* appropriately considered.  The issue instead turns on state law.

### 1.  The PSA does not preempt the State's regulation of its own conduct as trustee of public lands.

The Constitution "confers upon Congress the power to regulate individuals, not States." *New York v. United States*, 505 U.S. 144, 166 (1992).  "The allocation of power contained in the Commerce Clause, for example, authorizes Congress to regulate interstate commerce directly; it does not authorize Congress to regulate state governments' regulation

of interstate commerce." *Id.* Accordingly, "every form of preemption is based on a federal law that regulates the conduct of private actors, not the States." *Murphy v. NCAA*, 584 U.S. 453, 479 (2018).

The PSA is no exception. It authorizes PHMSA to "prescribe minimum safety standards for pipeline[s]." 49 U.S.C. §60102(a)(2). PHMSA's standards apply to private actors: "the owners or operators of pipeline facilities." *Id.* §60102(a)(2)(A). And they regulate private conduct: "the design, installation, inspection, emergency plans and procedures, testing, construction, extension, operation, replacement, and maintenance of pipeline facilities." *Id.* §60102(a)(2)(B).

The state-law "due findings" requirement, on the other hand, applies to the State, which must make findings about the public trust. And it regulates the conduct of the *State*, as trustee of public lands, not the conduct of any private entity.

The PSA does not regulate the rules that states may impose on themselves as trustees of public property. That would be *highly* unusual. Congress must "enact exceedingly clear language," *U.S. Forest Serv. v. Cowpasture River Pres. Ass'n,* 590 U.S. 604, 622 (2020), before the Court will infer that it intended to interfere with "a decision

28

of the most fundamental sort for a sovereign entity," *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991), such as the State's obligations as trustee of sovereign lands, *Coeur d'Alene*, 521 U.S. at 283. Enbridge can identify nothing close.

### 2. The PSA does not govern property rights.

The public-trust doctrine is a *property* doctrine, not a pipeline regulation. The question raised by Section I.B of the Notice is whether Enbridge ever received valid property rights authorizing it to locate the Straits Pipelines on a specific strip of state land. The PSA has nothing to say on that topic. Unlike in the natural gas context, Congress gave federal agencies no role in conferring property rights to operate a pipeline on a specific piece of property. *Cf.* 15 U.S.C. §717f(h); *PennEast Pipeline Co. v. New Jersey*, 594 U.S. 482, 489 (2021). The PSA instead remains "silent as to rights-of-way and easements." *Columbia Gas Transmission Corp. v. Drain*, 191 F.3d 552, 555-56 (4th Cir. 1999).

To be sure, if the 1953 easement is invalid, that has consequences for Enbridge. Without valid property rights or the State's consent, Enbridge cannot operate pipelines on state land. But the PSA's preemption clause is not a command that states may not do anything

29

that would impair a company's ability to operate a pipeline. (*Contra* Op., R.164, PageID.2484-85.)  It is a prohibition on "adopt[ing] or continu[ing] in force safety standards."  49 U.S.C. §60104(c).  And when the State declared Enbridge's easement invalid, it did not impose a "safety standard" within the PSA's ambit.  Arg. §1.B, above.  Whether Enbridge's easement is valid is a matter Congress placed beyond PHMSA's reach, 49 U.S.C. §60104(e), and on which the PSA is silent.

### 3.   The PSA does not preempt safety considerations.

The district court is correct that, as part of the State's responsibilities under the public-trust doctrine, "Michigan officials would have to review whether the pipeline poses a safety risk to the environment" to convey a valid easement.  (Op., R.164, PageID.2490.)  But the PSA does not prevent state officials from satisfying that obligation.  There is an important "distinction between safety *standards*—which the PSA preempts—and safety *considerations*—which the PSA does not preempt."  *Couser v. Shelby Cnty.*, 139 F.4th 664, 671 (8th Cir. 2025).

Siting authorities have wide latitude to *consider* environmental issues and safety risks when determining pipeline routing.  *See, e.g.,*

49 U.S.C. §60104(e); PST, n.15 above, §4.3; H.R. Rep. No. 90-1390, 35-36; 18 C.F.R. Part 380.  And it would be unreasonable to expect *any* landowner to allow a pipeline to be located on its land without thinking about safety risks.  Nothing in the PSA prohibits doing so if safety is considered in aid of a decision about *where* a pipeline may be located.

The district court rejected this argument, in part, on the basis that "Michigan made its 'location and routing' determination when it agreed to the 1953 Easement."  (Op., R.164, PageID.2492.)  That is of course true.  The grant of the 1953 easement was a location and routing determination.  But so is its revocation.

The district court's logic that, having once said "yes" to the Straits Pipelines, the PSA renders Michigan forever powerless to say "no" suffers from several flaws.  Section 60104(e) does not distinguish, as the district court did, between the location of new and existing pipelines.  Rather, it places "location" issues categorically outside of PHMSA's jurisdiction—leaving the "location" of pipelines to states, local governments, and landowners.  Nothing in the PSA's text says that, once a pipeline is sited, it cannot be removed.  And to the extent any

31

distinction exists between "new" location decisions and "initial" ones, Section I.B of the Notice *challenges the validity of the initial one.*

None of this is to definitively say the State Officials can now correct a location decision that was improperly made over 70 years ago. The rule is: "To the extent that the conveyances to private parties purported to include public trust lands, the States may strike them down, *if state law permits.*" *Phillips Petrol. Co. v. Mississippi*, 484 U.S. 469, 494 (1988) (O'Connor, J., dissenting) (emphasis added). Whether "state law permits" the State Officials to correct the sins of the past has been extensively briefed, argued, and will be decided in *Nessel.* The PSA has nothing to say about it.

> **D.   Section II of the Notice is not preempted because the PSA did not retroactively nullify the terms and conditions of the 1953 easement contract.**

If the 1953 easement *is* valid, the State must be able to enforce its terms, which were conditions of Enbridge being granted access to the land. The district court enjoined the State Officials from doing so, reasoning that the PSA retroactively invalidated the contract's terms. That is wrong for three reasons.

32

*First*, like a private property owner, a state "can prohibit absolutely or fix the terms on which its property may be used." *Light v. United States*, 220 U.S. 523, 536 (1911).  And when a state "manage[s] its own property" in such a way that "analogous private conduct would be permitted," courts presume the state's conduct is not preempted. *Building & Constr. Trades Council v. Associated Builders & Contractors of Mass./R.I., Inc.*, 507 U.S. 218, 227 (1993) (*Boston Harbor*).  Here, nothing suggests Congress intended to treat the State as landowner differently than other landowners.  And the State acted in such a way that analogous private conduct would be permitted.

*Second*, the district court's holding that the PSA invalidated the terms of the 1953 easement raises retroactivity concerns, which can and should be avoided.  Giving §60104(c) its natural reading—that it preempts only state regulation, not land-use contracts—solves the issue.  Alternatively, reading it in light of neighboring provisions avoids the retroactive nullification of contract rights.  Both interpretations are more faithful to congressional intent than the district court's.

*Third*, if the PSA *does* retroactively divest the State of its rights under the 1953 easement, the entire contract fails, and Enbridge has no

right to occupy the State's land. A federal court cannot award Enbridge the benefit of the 1953 contract while stripping the State of the promises it was given in exchange.

### 1.    The PSA does not divest the State of its proprietary rights as landowner.

Section II of the Notice is not preempted by the PSA because the State acted as a typical landowner when it bargained for express terms in the 1953 easement and exercised its contractual right to terminate.

### a.    Private landowners may enforce the terms of easement contracts.

The PSA does not preclude private landowners from conditioning pipeline easements on terms related to pipeline safety. Because PHMSA's safety standards are *minimums*, pipeline operators may agree by contract to exceed them. 49 U.S.C. §60102(a)(2) (PHMSA "prescribe[s] minimum safety standards"); 35 Fed. Reg. 13,250 ("[A]n operator may voluntarily exceed these standards."). And since §60104(c) applies only to "State authorit[ies]," it does not restrict private property owners from bargaining for such terms.

34

In fact, the Pipelines Informed Planning Alliance (PIPA), a PHMSA-sponsored initiative,[16] *recommends* including provisions that "establish the rights and responsibilities of each party" in pipeline easements, including: "[s]ite-specific environmental issues" and "transmission pipeline details, such as: depth of cover requirements; number and size of pipelines; additional line rights; product transported; maximum size; maximum pressure; and above-ground facilities, such as but not limited to: test leads, markers, rectifiers, casing vents, valves and valve actuators, meter stations and pig launcher/receivers." PIPA Recommended Practice BL07, https://primis.phmsa.dot.gov/stakeholder-comms/pipa/pipa-practice-bl07/ (last visited May 4, 2026).

When such terms are contained in a private pipeline easement, they may be enforced. In an illustrative case, SFPP operated a pipeline on an easement granted by Union Pacific. *SFPP, L.P. v. Union Pacific R.R. Co.*, No. 05-cv-1015, 2006 WL 8448721 (C.D. Cal. Mar. 20, 2006). According to Union Pacific, the easement contract allowed it to require that "the pipeline be located at least 25 feet from the centerline of the

---

[16] Wiese Ltr., n.12 above.

nearest track and have a minimum 6-feet of ground cover." *SFPP, L.P. v. Union Pacific R.R. Co.*, No. 05-cv-1015, 2006 WL 8448728 (C.D. Cal. Aug. 30, 2006). SFPP argued that Union Pacific's attempt to impose that standard "constitute[d] an impermissible interference with federal safety regulation of an interstate pipeline, in violation of the PSA." 2006 WL 8448721, at *3 (brackets omitted).

The court rejected SFPP's argument, holding that because "Union Pacific is attempting to enforce a private contract agreement," preemption did not apply. 2006 WL 8448728, at *9. The Ninth Circuit affirmed, holding that the PSA does not preempt parties from "demanding compliance with a private agreement." *SFPP, L.P. v. Union Pacific R.R. Co.*, 274 F. App'x 549, 550 (9th Cir. 2008).

### b. Congress did not intend to treat states worse than other landowners.

Ordinarily, "pre-emption doctrines apply only to state *regulation.*" *Boston Harbor*, 507 U.S. at 227 (emphasis in original). When a state acts as property owner, rather than regulator, it typically enjoys the same "freedoms from federal constraints" as other proprietors. *Reeves, Inc. v. Stake*, 447 U.S. 429, 438 (1980). Thus, when a state "manages

36

property as a private party would," courts "presume that its actions are not subject to preemption." *Airline Servs. Providers Ass'n v. Los Angeles World Airports*, 873 F.3d 1074, 1079 (9th Cir. 2017) (cleaned up). "Only if a statute evinces an intent to preempt such proprietary actions … is the presumption overcome and the action preempted." *Id.*

Here, there is no indication Congress intended to treat state and private landowners differently. The PSA treats states the same as any other person. *See* 49 U.S.C. §60101(a)(17) (defining "person" to include "a State"). It has nothing to do with the location or route of pipelines, *id.* §60104(e), and is "silent as to rights-of-way and easements," *Columbia Gas*, 191 F.3d at 555-56. Nothing suggests Congress intended to strip state landowners of property rights that others retain.

Instead, Congress' concern in §60104(c) was "uniformity of *regulation*." H.R. Rep. No. 90-1390, 25 (emphasis added). The provision's language—"State authority," "adopt or continue in force," "safety standards"—connotes regulation. Indeed, the provision was initially located in a section titled, "Regulations Governing Hazardous-Liquid Pipelines." Pub. L. 96-129, 93 Stat. 1003, §203 (Nov. 30, 1979). From 1979 until 1994, the clause referred to a "State agency," *see id.*,

37

which means a "regulatory body of a state," *Agency, Black's Law Dictionary* (12th ed. 2024). The 1994 revision from "agency" to "authority" was not a substantive change. H.R. Rep. No. 103-180 (1993), 5, 438. And the PSA continues to refer to "a State authority" as a body with "regulatory jurisdiction." 49 U.S.C. §60105(b)(1).

The presumption that Congress intends only to preempt regulations is unrebutted and entirely apt. The best interpretation of §60104(c)'s plain language, understood in context, is that it preempts only regulation. The only court of appeals to address the issue has agreed. *See Olympic Pipe Line Co. v. City of Seattle*, 437 F.3d 872, 881 (9th Cir. 2006) (a city may "contractually require" safety conditions if it "acted as a municipal proprietor" in entering the contract).

### c. The State acted as landowner, not regulator, when it terminated the 1953 easement.

The question then becomes whether the State's termination of the 1953 easement contract for breach is preempted, regulatory conduct. To answer that question, the Court compares the State's conduct "to the typical behavior of private parties." *Allied Constr. Indus. v. City of Cincinnati*, 879 F.3d 215, 221 (6th Cir. 2018).

38

When a state uses contract terms "as part and parcel of a governmental program wielding coercive power over private parties, backed by the threat of criminal punishment," it acts "in a regulatory rather than proprietary mode." *Am. Trucking Ass'ns v. City of Los Angeles*, 569 U.S. 641, 650 (2013) (*Port of Los Angeles*). But when a state "contract[s] in a way that the owner of an ordinary commercial enterprise could mimic," and does not use a tool "which only a government can wield," its conduct is proprietary. *Id.,* 651. In short, when a state's conduct is "akin to an action by a private landowner," it is not preempted. *Superior Comm'cns v. City of Riverview*, 881 F.3d 432, 445 (6th Cir. 2018) (cleaned up).

The district court held that the State acted as a regulator by including safety-related terms in the easement, relying heavily on *Olympic Pipe*. (Op., R.164, PageID.2486.) But that case is readily distinguishable. In *Olympic Pipe*, Seattle attempted to use its permitting authority to force a pipeline operator to agree—on pain of criminal sanctions—to a list of 33 safety demands. 437 F.3d at 875. A Seattle ordinance requires a permit to operate a pipeline along city streets, Seattle Mun. Code. 15.32.010, and Olympic's permit had

39

expired, *Olympic Pipe*, 437 F.3d at 882 n.27.  "Seattle declined to renew Olympic's franchise for the section of pipeline within the city limits until Olympic complied with the City's list of pipeline safety demands." *Id.,* 874.  Expressly invoking "its police and regulatory powers," Seattle warned that "Olympic's failure to comply would subject the company to criminal sanctions."  *Id.,* 875, 881-82.[17]

That has all the hallmarks of regulation.  Seattle was exercising its "regulatory power of license nonrenewal" to coerce a private party's conduct.  *See Boston Harbor*, 507 U.S. at 227 (discussing *Golden State Transit Corp. v. City of Los Angeles*, 475 U.S. 608, 619 (1986)).  The permit was "part and parcel of a government program wielding coercive power over private parties."  *Port of Los Angeles*, 569 U.S. at 650.  And Seattle used "a tool to fulfill [its] goals which only a government can wield:  the hammer of the criminal law."  *Id.,* 651.

---

[17] The *Olympic Pipe* contracts are available online.  Franchise, https://clerk.seattle.gov/~archives/Ordinances/Ord_116331.pdf (last visited May 4, 2026); Indemnity Agreement, https://clerk.seattle.gov/~CFS/CF_299070.pdf (last visited May 4, 2026). The letters Seattle sent to Olympic are available at No. 2:03-cv-02343 (W.D. Wash), R.3-5 to 3-7.

Here, by contrast, the State's conduct is akin to a private landowner's. In an analogous case, this Court held that a municipality did not engage in preempted, regulatory conduct when it included safety standards in a lease agreement because "the City, in its capacity as a property owner, had the 'right to decline to lease the property except on agreed conditions.'" *Superior Comm'cns*, 881 F.3d at 445 (quoting *Sprint Spectrum L.P. v. Mills*, 283 F.3d 404 (2d Cir. 2002)). Indeed, the State's conduct here is almost exactly like Union Pacific's permissible conduct in *SFPP*. The 1953 easement is not part of a larger regulatory scheme. It is an exercise of property rights regarding a specific strip of land. And invoking a contract's termination clause is not wielding a uniquely governmental power. Accordingly, Section II of the Notice is not preempted by the PSA.

### 2. The PSA does not retroactively nullify the terms of the 1953 easement.

The district court's interpretation of the PSA also raises a related concern. The 1953 easement was negotiated and executed, and the Straits Pipelines were built, long before the PSA was enacted or any federal safety standards were promulgated. Accordingly, the State and

41

Enbridge agreed upon site-specific standards governing the design, installation, construction, and initial testing of the Straits Pipelines. The PSA did not arrive until decades later.

As the district court recognized, finding the contract's terms invalidated by later-enacted law "deprived [the State] of part of the bargain back in 1953." (11/12/25 Tr., R.160, PageID.2431.) Although the district court was "bother[ed]" by that result, *id.*, it concluded that "it does not matter that Defendants enforced safety provisions contained in an easement contract that existed before the Pipeline Safety Act was passed," reading the words "*or continue in force*" in §60104(c) to require the retroactive nullification of contract rights. (Op., R.164, PageID.2486-87 (emphasis supplied by district court).)

The district court's first instinct was correct. Congress should not be understood to have deprived a state of its property rights based on a later-enacted statute. What the district court missed was that, here, the retroactive nullification of contract rights can be easily avoided by either: (1) recognizing that the PSA preempts only *regulations*, not land-use contracts; or (2) interpreting §60104(c) in the context of

42

neighboring provisions, which make clear that Congress intended to leave the terms of prior siting agreements in place.

### a.   Congress intended to preempt regulations, not to retroactively invalidate contracts.

"Retroactivity is not favored in the law." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). Statutes "will not be construed to have retroactive effect unless their language requires this result." *Id.* This "presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994).

"[A]ntiretroactivity concerns are most pressing in cases involving 'new provisions affecting contractual or property rights, matters in which predictability and stability are of prime importance.'" *Republic of Austria v. Altmann*, 541 U.S. 677, 693 (2004) (quoting *Landgraf*, 511 U.S. at 271). The problem occurs when a statute "attaches new legal consequences to events completed before its enactment." *Landgraf*, 511 U.S. at 271. Preempting existing laws and regulations is not an issue: "a statute does not operate retrospectively merely because it

43

upsets expectations in prior law." *BellSouth Telecomms., Inc. v. Se. Tel., Inc.*, 462 F.3d 650, 658 (6th Cir. 2006) (cleaned up).

Interpreting §60104(c) to preempt only *regulations* solves the antiretroactivity problem. This Court has held that parties have "no settled expectation—let alone a vested right—in the use of substantive regulations in force." *Bellsouth*, 462 F.3d at 663 (cleaned up). Thus, if Congress' instruction that a state agency may not "continue in force safety standards" simply means that safety regulations then in force could no longer be applied, there is no issue.

Reading §60104(c) that way makes sense. The clause is best understood in context to target state regulation. *See* Arg. §I.C.1, above. And the words "continue in force" can easily be read to mean that agency regulations with the "force of law" could no longer be applied. *See, e.g.*, Black's Law Dictionary (12th ed. 2024) (defining "administrative rule" as "[a]n officially promulgated agency regulation that has the force of law"); *Port of Los Angeles*, 569 U.S. at 649 ("force or effect of law" language "draws a rough line between a government's exercise of regulatory authority and its own contract-based [behavior]").

Because the PSA does not manifest a "clear congressional intent" to invalidate bargained-for rights in preexisting contracts, *Landgraf*, 511 U.S. at 280, the district court's interpretation is wrong.

> ### b. Statutory context confirms that Congress did not retroactively invalidate the 1953 easement's terms.

Even if §60104(c) *did* preempt some terms in prior land use contracts—and it did not—it would still not preempt the terms at issue here. "A fundamental canon of statutory construction requires [courts] to read words in context, with a view to their place in the overall statutory scheme." *Allen*, 83 F.4th at 568-69. And when the preemption clause (§60104(c)) is read in light of the PSA's sections on nonapplication (§60104(b)), location and routing (§60104(e)), tort liability (§60120(c)), and additional remedies (§60121(d)), it becomes clear that Congress did not intend to nullify *any* of the terms that gave rise to the easement's termination.

The nonapplication provision states: "A design, installation, construction, initial inspection, or initial testing standard does not apply to a pipeline facility existing when the standard is adopted." 49 U.S.C. §60104(b). Congress included this carveout based on lobbying

45

from the pipeline industry, which was concerned about the potential costs if PHMSA began retroactively holding existing pipelines to different "design, installation, construction, initial inspection, and initial testing" standards than applied when the pipes were built.  H.R. Rep. No. 90-1390, 20-23.  Enbridge has benefited tremendously from the provision, as the Straits Pipelines do not satisfy modern design standards.  *See, e.g.*, 49 C.F.R. §192.327(e) (requiring pipelines in navigable waters to be buried).

But that raises the question:  if federal design, installation, and construction standards don't apply to the Straits Pipelines, what design, installation, and construction standards *do* apply?  The 1953 easement provides the answer.  It sets the design, installation, construction, and initial-testing standards for the Straits Pipelines.  (Easement, R.158, PageID.2376-78.)  Enbridge wants to exist in a free-for-all zone, where it's bound by neither PHMSA's design standards nor the standards it agreed to in 1953.

The easement's termination was based in part on Enbridge's failure to adhere to three of the design, installation, and/or construction standards that were negotiated and agreed to before the PSA was

46

enacted.  (Notice, R.158, PageID.2364-67.)  Congress' decision to exempt the Straits Pipelines from later-enacted standards manifests its intent to leave that bargain in place.

The fourth basis for the termination—Enbridge's failure to "exercise the due care of a reasonably prudent person for the safety and welfare of all persons and of all public and private property"—similarly falls outside the PSA's preemptive reach.[18]  (*Id.*, PageID.2362-63; Easement, R.158, PageID.2375-76.)  While "due care" is not a design, installation, or construction standard, it *is* a tort standard.  *See, e.g.*, *Mortensen v. Comm'r*, 440 F.3d 375 (6th Cir. 2006) (defining "negligence" as "lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances.").  And the PSA "does not affect the tort liability of any person."  49 U.S.C. §60120(c).  As the district court recognized, the PSA would "allow a government authority or private party to sue a pipeline operator for negligence."  (Op., R.164, PageID.2479.)

---

[18] It is not uncommon to include terms like this in easements.  *See, e.g.*, *SFPP*, 2006 WL 8448721, at *1 (easement contract with similar terms).

47

Thus, the easement's "due care" term does not impose any new or additional "standard" on Enbridge. Instead, the effect of including the condition in the contract is to provide the State with a contractual remedy in addition to its tort remedy. And Congress did not intend to deprive any person, including the State, of legal remedies available at law. *See* 49 U.S.C. §60120(d) ("A remedy under this section is in addition to any other remedies provided by law.").

Enbridge's use of the State's land "must be confined to the plain and unambiguous terms of the easement." *Dyball v. Lennox*, 680 N.W.2d 522, 528 (Mich. Ct. App. 2004). Michigan's right to insist on those terms—negotiated decades before the PSA was enacted—must be preserved in the absence of "clear congressional intent" to retroactively eradicate them. *Landgraf*, 511 U.S. at 280. Because the PSA manifests no such clear congressional intent, the district court's ruling that the PSA expressly preempts Section II of the Notice must be reversed.

### 3. If the PSA *does* render the essential terms of the 1953 easement unlawful, the entire contract fails, and Enbridge has no right to use the State's land.

The district court also committed another significant error. When a court holds that contract terms are unenforceable, it "*must* determine

48

whether those provisions are severable from the agreement as a whole or whether they render the entire agreement unenforceable." *Morrison v. Circuit City Stores, Inc.*, 317 F.3d 646, 674 (6th Cir. 2003) (en banc) (emphasis added). The State Officials repeatedly raised this issue. (Ans., R.110, PageID.1082; 9/5/25 Br., R.134, PageID.1788-89; 11/12/25 Tr., R.160, PageID.2423.) The district court erred by not considering it.

The rule in Michigan is that "[i]llegal portions of a contract may be severed" only if the illegal provision was not "central to the parties' agreement." *AFSCME Mich. Counsil 25 v. City of Detroit*, 704 N.W.2d 712, 716 (Mich. 2005). "If the agreements are interdependent and the parties would not have entered into one in the absence of the other, the contract will be regarded as entire and not divisible." *EPLET, LLC v. DTE Pontiac N., LLC*, 984 F.3d 493, 505 (6th Cir. 2021).

Here, the easement stated *three different times* that it was being granted "subject to the terms and conditions" that the district court found unenforceable. (Easement, R.158, PageID.2374-75.) It is unfathomable to think that, in an era of no pipeline-safety regulation, the State would have given Enbridge an irrevocable right to run crude oil pipelines across four miles of the State's most critical natural

49

resource—the Straits of Mackinac—without any enforceable agreement as to the pipelines' design, installation, construction, or standards of operation.  If the easement's terms were nullified by federal law—as the district court held—the entire contract fails.  *See, e.g.*, *Stokes v. Millen Roofing Co.*, 649 N.W.2d 371, 374 (Mich. 2002) (entire contract was void where an illegal term was "central to the parties' agreement").

Without a valid easement, Enbridge has no right to use or occupy the State's land.  So, even if the district court's merits ruling were correct—and it is not—the injunction cannot stand.

## II.    The district court erred by holding that the Notice is impliedly preempted by the Foreign Affairs Doctrine.

The district court also erred by holding that the Notice is impliedly preempted under the "Foreign Affairs Doctrine."  This Court has never recognized a preemption doctrine by that name or described its parameters.  In a novel, sweeping ruling that cannot be squared with the Constitution's text or design, the district court relied on outlier precedents that have been limited to their facts—and stretched them beyond their limits—to divest the State of control over its land.[19]

---

[19] For example, the district court relied heavily on *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396 (2003), a controversial 5-4 decision involving a

The precise legal basis for the district court's ruling is hard to discern.  (Op., R.164, PageID.2493-2500.)  The court pointed to three things.  *First*, it noted that Canada and the U.S. "disagree[]" with Michigan's decision to revoke and terminate the easement.  (*Id.,* PageID.2497-98.)  The district court said this "shared position makes it easy" to conclude that the State is preempted from exercising its property rights.  (*Id.,* PageID.2499.)  *Second*, the court stated that the Transit Treaty (which it declined to "fully interpret[]") "embodies" a "foreign policy" that preempts the Notice.  (*Id.,* PageID.2497 & n.13.)  *Third*, the court found that the State did not act in an area of "traditional state responsibility" and had impermissibly "intrude[d] on the United States foreign relation power" by revoking and terminating the easement in state land.  (*Id.,* PageID.2498-99.)

No aspect of that analysis satisfies the strictures the Constitution requires for any state action—particularly an exercise of the State's

California statute that targeted foreign insurance companies alleged to have participated in the theft of Jewish assets during the Holocaust. The Supreme Court has since explained that *Garamendi* is a "narrow and strictly limited" case "involv[ing] a narrow set of circumstances: the making of executive agreements to settle civil claims between American citizens and foreign governments or foreign nationals." *Medellín*, 552 U.S. at 531.  There is no such agreement here.

sovereign property rights—to be nullified by executive action.  The

Supreme Court has been clear:  "Invoking some brooding federal

interest or appealing to a judicial policy preference does not show

preemption."  *Garcia*, 589 U.S. at 202 (quoting *Virginia Uranium v.*

*Warren*, 587 U.S. 761, 767 (2019) (lead op. of Gorsuch, J.)).  Because the

district court's ruling rests on nothing more than "some brooding

federal interest," it must be reversed.

### A.    The Notice can only be preempted by the supreme Law of the Land.

Under the Supremacy Clause, the Constitution, federal statutes,

and treaties are "the supreme Law of the Land."  U.S. Const. Art. VI,

cl.2.  The Clause creates "a rule of decision":  courts "must not give

effect to state laws that conflict with federal laws."  *Armstrong v.*

*Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324 (2015).

Becoming "the supreme Law of the Land" requires passing the

safeguards required for "the creation of positive law."  *United States v.*

*Rife*, 33 F.4th 838, 843 (6th Cir. 2022).  "For statutes, those procedures

are bicameralism and presentment."  *Id.* (citing Art. I, §7).  "For the

Constitution—setting aside its original ratification under Article VII—

those procedures are the ones prescribed in Article V." *Id.* For treaties, "Article II grants the President the 'Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur.'" *Id.* (quoting Art. II, §2, cl.2); *see also INS v. Chadha*, 462 U.S. 919, 955 n.21 (1983) (explaining that, for treaties, the "bicameralism check" is replaced with the "alternative check[]" of requiring that "two-thirds of the Senators present concur").

The Notice can be preempted *only* by a positive enactment that clears those safeguards and constitutes the supreme Law of the Land. "There is no federal preemption *in vacuo*, without a constitutional text, federal statute, or treaty made under the authority of the United States." *Garcia*, 589 U.S. at 202. "Implied preemption analysis does not justify a freewheeling judicial inquiry into whether a state statute is in tension with federal objectives." *Chamber of Commerce v. Whiting*, 563 U.S. 582, 607 (2011) (cleaned up).

### B.    Mere "executive statements" and "policy preferences" cannot preempt state action.

Enbridge argued that the Notice could be preempted by the mere fact that the U.S. and Canada had filed amicus briefs objecting to the

53

State's action.  (*See* 11/12/25 Tr., R.160, PageID.2426-27.)  The district court agreed, stating:  "The Court could not find any other case in which every country affected by the disputed state action has so clearly indicated that a state's action interferes with their foreign policy."  (Op., R.164, PageID.2498.)  Yet, the State Officials repeatedly cited and raised at oral argument *exactly* such a case, which the district court did not acknowledge or mention once in its opinion.

In *Medellín v. Texas*, 552 U.S. 491 (2008), the State of Texas arrested, convicted, and sentenced to death José Medellín without allowing him to contact his embassy or consulate, as required by a treaty to which the U.S. is a party.  *Id.,* 502.  Mexico brought a claim against the U.S. in the International Court of Justice (ICJ), which held that the treaty had been violated and the Mexican nationals who were affected were entitled to review and reconsideration of their convictions and sentences.  *Id.,* 497-98.  President George W. Bush issued a memorandum stating:  "I have determined, pursuant to the authority vested in me as President by the Constitution and the laws of the United States of America, that the United States will discharge its international obligations … by having State courts give effect to the

54

decision [of the ICJ]." *Id.,* 503.  The Texas state court refused, finding that the President's Memorandum was not "binding federal law," so Texas did not have to comply with it.  *Id.,* 504.

*Medellín* is *exactly* the case the district court said it could not find, one "in which every country affected by the disputed state action has so clearly indicated that a state's action interferes with their foreign policy." (Op., R.164, PageID.2498.)  A memorandum from the President is a much *stronger* expression of U.S. foreign policy than an amicus brief submitted by Department of Justice attorneys.  Yet even there, the Supreme Court refused to give the executive branch's statements binding force over the states.

As the Fifth Circuit recently observed, the teaching of *Medellín* is that "foreign policy below the binding level of a treaty or legislation cannot displace state law."  *Texas v. U.S. Dep't of Homeland Security,* 123 F.4th 186, 214 (5th Cir. 2024).  "[C]oncerns about international relations do not erase property owners' rights."  *Id.*[20]

---

[20] *See also* Michael R. Ramsey, *International Wrongs, State Laws and Presidential Policies*, 32 Loy. L.A. Int'l & Comp. L. Rev. 19, 21 (2011) (discussing *Medellín*); William S. Dodge, *DOJ Takes Broad View of Foreign Affairs Preemption in Pipeline Case*, Transnat'l Litig. Blog,

55

### C.   The Notice is not preempted by the Transit Treaty.

The Transit Treaty is the only law that Enbridge cited with the potential force to preempt the Notice under the Supremacy Clause.  But Enbridge's Treaty argument suffers from two defects.  *First*, Enbridge is not a party to the Treaty.  It has neither standing nor a right of action to sue the State Officials in domestic court for an alleged violation.  *Second*, the Treaty does not bar states from exercising their property rights or prohibit them from enforcing generally applicable property laws.  To have that effect, an exceptionally clear statement would be required.  And there is none in the Treaty.

The district court sidestepped both these arguments and enjoined the Notice without "determin[ing] [the Treaty's] specific requirements." (Op., R.164, PageID.2497.)  It erred by doing so.  If the Notice complies with the Treaty, the Treaty does not preempt the Notice.  Making a Treaty-based preemption ruling without interpreting the Treaty's terms was not an option.

---

https://tlblog.org/doj-takes-broad-view-of-foreign-affairs-preemption-in-pipeline-case/ (Oct. 1, 2025) (applying *Medellín* to this dispute).

### 1. Enbridge had no standing or right of action to bring a Treaty claim.

A treaty is "primarily a compact between independent nations." *Medellín*, 552 U.S. at 505. While treaties are the supreme Law of the Land, the Supremacy Clause "does not create a cause of action." *Armstrong*, 575 U.S. at 325. Like when Congress legislates under Article I, the President and Senate have "broad discretion over the manner of implementing" their agreements. *See id.* It is up to them whether to confer a right of action on non-parties to bring treaty-based claims for relief in domestic courts.

"[C]ourts presume that the rights created by an international treaty belong to a state and that a private individual cannot enforce them." *United States v. Emuegbunam*, 268 F.3d 377, 389 (6th Cir. 2001). Instead, a treaty "ordinarily depends for the enforcement of its provisions on the interest and the honor of the governments which are parties to it. If these interests fail, its infraction becomes the subject of international negotiations and reclamations." *Medellín*, 552 U.S. at 505 (cleaned up). "It is obvious that with all this the judicial courts have nothing to do and can give no redress." *Id.*

57

The Treaty manifests no intent to give non-parties standing or a right of action to bring treaty-based claims in domestic courts. As one court observed: "Enbridge is not a party to the Transit Treaty, and nothing in the Treaty suggests that a private entity could bring a cause of action to enforce it or even that it may be enforced in federal court." *Bad River Band of the Lake Superior Tribe of Chippewa Indians of the Bad River Reservation v. Enbridge Energy Co.*, No. 19-cv-602, 2022 WL 17249085, at \*5 (W.D. Wis. Nov. 28, 2022). "Instead, the signatory countries may bring claims under the Transit Treaty pursuant to a specific arbitration process, as Canada has done with respect to Line 5." *Id.*; Treaty, art. IX, 28 U.S.T. 7449. If Canada succeeds in the arbitration process, it will be entitled to whatever remedies an arbitral panel may award. But "with all this the judicial courts have nothing to do and can give no redress." *Medellín*, 552 U.S. at 505. The district court erred by allowing Enbridge to bring a Treaty-based claim in domestic court.

### 2. The Notice does not violate the Transit Treaty.

If the Transit Treaty is to serve as a basis for federal preemption, it *is* necessary "to determine its specific requirements." (*Contra* Op.,

R.164, PageID.2497.)  The Supremacy Clause only does preemptive work if state and federal law conflict.  *Armstrong*, 575 U.S. at 324.  Here, they do not.  The Notice complies with the Treaty, so there is no basis to find Treaty-based preemption.

### a.    A clear statement is required to divest the State of ownership and control over sovereign lands.

"Proper interpretation of a treaty presents a question of law that this court reviews de novo."  *Emuegbunam*, 268 F.3d at 389.  The interpretation of a treaty is "like the interpretation of a statute."  *Medellín*, 552 U.S. at 506.  The Court begins with the treaty's text, *id.*, which must be understood against "background principles of construction," *Bond v. United States*, 572 U.S. 844, 857 (2014).  Among them are that "if the Federal Government would radically readjust the balance of state and national authority, those charged with the duty of legislating must be reasonably explicit about it."  *Id.* (cleaned up).

The Supreme Court has required "exceedingly clear language" to find that a federal law "significantly alter[s] the balance between federal and state power."  *U.S. Forest Serv.,* 590 U.S. at 621-22; *Bond*, 572 U.S. at 857-58 (foreign affairs context); *Rapanos v. United States*,

59

547 U.S. 715, 738 (2006) (plurality op. of Scalia, J.) (land use); *Solid Waste Agency of N. Cook Cnty. v. Army Corps of Eng'rs*, 531 U.S. 159, 168 (2001) (land and water use); *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 544 (1994) (title to real estate); *Merrick v. Diageo Am. Supply, Inc.*, 805 F.3d 685, 694 (6th Cir. 2015) (environmental regulation).

Here, a clear statement is required to find that the State has been divested of its proprietary right to exclude and its sovereign role in managing submerged lands. As the Supreme Court has observed, "the State's title to lands underlying navigable waters within its boundaries is conferred not by Congress but by the Constitution itself." *Oregon ex rel. State Land Bd. v. Corvallis Sand & Gravel Co.*, 429 U.S. 363, 374 (1977). The ability to control the use of these "sovereign lands" has long been considered "an essential attribute of sovereignty." *Utah Div. of State Lands v. United States*, 482 U.S. 193, 195 (1987); *see also Coeur d'Alene*, 521 U.S. at 283 (stressing "[t]he importance of these lands to state sovereignty"). There should be no question that finding preemption here would radically readjust the balance of state and national authority.

### b.    The Treaty does not include a clear statement stripping the State of its proprietary and sovereign rights.

The Transit Treaty contains nothing like the clear statement required.  The Treaty was negotiated and entered against the backdrop of the 1973 oil embargo,[21] and rising economic nationalism in Canada.[22] The United States sought to construct a natural gas pipeline to transmit Alaskan gas across Canada to U.S. markets.  Responding to the political dynamics of the time, the two countries agreed to the Treaty to ensure that public authorities would not take discriminatory actions against foreign pipelines.

To that end, Article II(1) of the Treaty states:  "No public authority in the territory of either Party shall institute any measures…which are intended to, or which would have the effect of, impeding, diverting, redirecting or interfering with in any way the

---

[21] *See* U.S. Dep't of State, Office of the Historian, *Oil Embargo, 1973-1974*, https://history.state.gov/milestones/1969-1976/oil-embargo (last visited May 4, 2026).

[22] *See* Taylor C. Noakes, *Oil and Gas Policy in Canada*, 1947-80, https://thecanadianencyclopedia.ca/en/article/oil-and-gas-policy-in-canada-1947-80 (May 22, 2020); Sasha Yusufali & Larry R. Pratt, *Petro-Canada*, https://thecanadianencyclopedia.ca/en/article/petro-canada (Dec. 16, 2013).

61

transmission of hydrocarbon in transit." Treaty, art. II(1), 28 U.S.T. 7449. Article IV of the Treaty then limits Article II, stating "*[n]otwithstanding the provisions of Article II*," transit pipelines "shall be subject to regulations by the appropriate governmental authorities … in the same manner as for any other pipelines … with respect to such matters as…environmental protection," provided that "[a]ll regulations, requirements, terms and conditions" are "just and reasonable" and "applied equally to all persons and in the same manner." *Id.*, art. IV (emphasis added).

This express "'notwithstanding' clause clearly signals the drafter's intention that the provisions of the 'notwithstanding' section override conflicting provisions of any other section." *Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 18 (1993). In other words, Article IV operates as "an express savings clause" to Article II. *Portland Pipe Line Corp. v. City of S. Portland*, 288 F. Supp. 3d 321, 443 (D. Me. 2017).

When the two provisions are read together, it is clear that "the federal policy embodied in the Transit Pipeline Agreement is one of anti-discrimination." *Id.* A public authority *can* take measures that would have the effect of impeding, diverting, redirecting, or interfering

62

with the transmission of hydrocarbons, *but only if* the "regulations, requirements, terms and conditions" being enforced are "just and reasonable" and "applied equally to all persons and in the same manner." Treaty, arts. II, IV.

The State's Notice does not violate the Treaty for several reasons. *First*, it is at best unclear whether a landowner's termination and revocation of an easement falls within Article II's prohibition on a "public authority" "institut[ing] … measures." *Id.*, art. II(1). That language is more naturally read to encompass exercising police powers than property rights. *See* Black's Law Dictionary (12th ed. 2024) (defining "institute" as "[t]o begin or start"; and "measures," in part, as "course of action proposed or taken by a government, such as a legislative bill or an executive action").

*Second*, even if Article II is implicated, requiring Enbridge to have and comply with a valid easement fits comfortably within Article IV. State property law applies equally to domestic and international pipelines. And nothing in the Treaty prohibits states from enforcing generally applicable property "requirements." Treaty, art. IV(2); *see*

63

*Bad River*, 2022 WL 17249085 at \*5 (tribe's action to eject part of Line 5 due to the lack of an easement did not violate the Transit Treaty).

*Third*, if the U.S. and Canada intended to divest landowners of their property rights, one would expect there to be *some* mention of that in the Treaty. But there is *none*. Construing a 1977 Treaty to have stripped the State of its right to terminate the 1953 easement has all the same retroactivity and severability problems as construing the PSA to have that effect. *See* §§I.D.2-I.D.3, above. Such an interpretation should be avoided for those same reasons. It is not plausible to think the President and two-thirds of the Senate intended the Treaty to have "overridden all private property rights under state, provincial, and tribal law … despite saying not one word to that effect."[23]

*Fourth*, in addition to this deafening silence, substantial contextual evidence shows that the U.S. and Canada *did not* intend to upend the ordinary requirements that apply to every other pipeline. Article II(3) of the Treaty contemplates that the operators of transit pipelines must obtain "such permits, licenses, *or other authorizations* as may be required." Treaty, art. II(3) (emphasis added). And a series of

---

[23] Dodge, n.8, above (Feb. 15, 2024).

Presidential Permits issued over the course of many decades have routinely required transit pipeline operators to "acquire such right-of-way grants, easements, permits, and other authorizations as may become necessary and appropriate," including specifying that such a "right-of-way" must be "*valid under the laws of the State of Michigan.*" (Pres. Permits, R.134-2, PageID.1830, 1835, 1839, 1845, 1849, 1852; *id.*, PageID.1825 (emphasis added).)

Indeed, during the pendency of this appeal the Presidential Permit for Line 5 was reissued. It expressly requires Enbridge to "acquir[e] any right-of-way grants or easements, permits, and other authorizations as may become necessary or appropriate."[24] Enforcing the requirement to have and comply with a valid easement for the Straits Pipelines does not violate U.S. foreign policy.[25]

---

[24] *Presidential Permit*, https://www.whitehouse.gov/presidential-actions/2026/04/presidential-permit-authorizing-enbridge-energy-company-inc-to-operate-and-maintain-existing-pipeline-facilities-at-st-clair-county-michigan-at-the-international-boundary-between-the-united-stat/ (Apr. 15, 2026).

[25] While the U.S. has not publicly interpreted the Treaty, it argued in a prior amicus brief that Enbridge "lacked the legal right to remain on the Band's lands" and was "trespassing" without a valid easement for Line 5. U.S. Br., *Bad River Band v. Enbridge*, No. 23-309, R.92, pp. 6, 10-22 (7th Cir. Apr. 8, 2024). The U.S. did not suggest the Treaty barred the Band's ejectment action. Instead, it argued the potential

**D.    None of the district court's other rationales show preemption.**

The district court also held that the Notice was preempted because it "disturbs foreign relations."  (Op., R.164, PageID.2498.)  Again, the district court was wrong.

The court began by finding the State did not act in an area of "traditional state responsibility" because its "real purpose" was to regulate safety.  (*Id.*)  There are many problems with this.  It is hard to imagine a more firmly entrenched area of "traditional state responsibility" than managing the use of submerged lands held in public trust.  *See* Arg. §II.B.2.a, above.  And inquiring into the State's "real purpose" is misguided because preemption depends "on *what* the State did, not *why* it did."  *Virginia Uranium*, 587 U.S. at 774.

Moreover, acting out of a concern for protecting a state's public lands and waters from impairment cannot somehow be transformed into an impermissible foreign-affairs motive.  In the circuits that have considered purpose, the question is whether the state actor's "'real purpose' [wa]s *to insert itself into foreign affairs.*"  *Gingery v. City of*

---

that an arbitral panel could find a Treaty violation and award damages should be considered as one factor at the *remedy* phase.  (*Id.,* 2, 28-30.)

*Glendale*, 831 F.3d 1222, 1228 (9th Cir. 2016) (emphasis added).  On the district court's *own conclusion* that the State's "real purpose" was to protect its lands, waters, and residents, the answer is no.

Next, the district court stated that the mere fact that Canada has invoked the Treaty's dispute-resolution process was "enough" to bar the State from exercising its property rights.  (Op., R.164, PageID.2499.)  Not so.  The mere *allegation* of a Treaty violation cannot preempt.  The court also cited statements in an amicus brief about potential economic impacts.  (*Id.*)  But Enbridge chose not to raise that issue, and there was no evidence on it.  The State has studied the matter *extensively*, and the evidence clearly shows that—if affected parties are given time to adjust—ceasing to use the Straits Pipelines would not cause supply shortages, price spikes, or economic harm.[26]

In sum, the district court identified no valid basis to find the Notice preempted under the Foreign Affairs Doctrine.  Its holding rests

---

[26] Press Release, *Attorney General Nessel Lauds "Game-changing" Line 5 Report*, https://www.michigan.gov/ag/news/press-releases/2023/11/17/attorney-general-nessel-lauds-game-changing-line-5-report (Nov. 17, 2023).

on a "brooding federal interest" or "judicial policy preference." *Garcia*,

589 U.S. at 202. Neither can preempt state law.

## III. The district court erred by unnecessarily deciding the constitutional preemption issues in this case.

Lying beneath the district court's substantive errors is a

procedural one: It never should have enjoined an independent

sovereign's exercise of property rights based on its analysis of complex

constitutional issues where an earlier-filed, state action could render

those issues moot. That is because federal courts must follow "several

fundamental principles of judicial restraint." *Torres*, 938 F.3d at 754.

Among them are that a court should not decide "questions of a

constitutional nature unless absolutely necessary," and should not

"formulate a rule of constitutional law broader than is required by the

precise facts to which it is to be applied." *Id.* (cleaned up). These

principles are "deeply rooted in our constitutional tradition" and "apply

as much to a question of preemption as to any other question of

constitutional law." *Id.* (cleaned up).

Here, it was not "absolutely necessary" for the district court to

decide Enbridge's preemption claims. Whether the 1953 easement was

validly conveyed—the issue raised by Section I.B of the Notice—has been briefed at length, twice argued, and will be decided in *Nessel*, clarifying the parties' legal rights. The State Officials withdrew their suit against Enbridge for the express purpose of allowing the validity of the easement to be decided there. And they have not sought to enforce the Notice since.

Unlike the district court, the *Nessel* court has been presented with *both* constitutional and non-constitutional grounds for decision. It can decide *first* whether the easement was invalid as a matter of state law and *then*, if so, whether any federal law prevents the State from revoking or terminating it. That is the ordinary "sequence" this Court has approved. *Torres*, 938 F.3d at 757. *Nessel* also presents alternative state-law grounds on which the use of the Straits Pipelines may be enjoined. If the Attorney General prevails on one of those grounds, there would be no need to address the public trust or breach issues.

Given this potential off-ramp, the district court should not have addressed the "hypothetical" issues presented here under established principles of constitutional avoidance. *Id.*; *e.g.*, *Allegheny County v. Frank Mashuda Co.*, 360 U.S. 185, 189 (1959).

69

The district court brushed past these concerns based on what it perceived as "the strength of Enbridge's preemption claims." (Op., R.164, PageID.2500.) But a court's assessment of the merits does not obviate the need for restraint in our federalist system. And as demonstrated above, Enbridge's claims are not nearly as strong as the district court believed. If the Court does not reverse, it should vacate and remand with instructions to stay the proceedings while the validity of the 1953 easement is decided in *Nessel*.

70

## CONCLUSION AND RELIEF REQUESTED

The district court's preemption rulings should be reversed.

Alternatively, the Court should vacate and remand with instructions to

stay while the validity of the 1953 easement is decided in *Nessel*.

Respectfully submitted,


/s/ *Keith D. Underkoffler*
Keith D. Underkoffler
Echo Aloe
Assistant Attorneys General
Counsel of Record
Environment, Natural
Resources, and Agriculture
Division
P.O. Box 30755
Lansing, MI 48909
(517) 335-7664
underkofflerk@michigan.gov
aloee1@michigan.gov

Daniel P. Bock
Special Assistant Attorney
General
Fahey Schultz Burzych Rhodes
PLC
4151 Okemos Road
Okemos, MI 48864
(517) 312-3130
dbock@fsbrlaw.com

Dated:  May 4, 2026

71

## CERTIFICATE OF COMPLIANCE

Certificate of Compliance with Type-Volume Limit,
Typeface Requirements, and Type Style Requirements

1.      This brief complies with the type-volume limitation of

Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because, excluding

the part of the document exempted by Federal Rule of Appellate

Procedure 32(f), this brief contains no more than 13,000 words.  This

document contains 12,989 words.

2.      This document complies with the typeface requirements of

Federal Rule of Appellate Procedure 32(a)(5) and the type-style

requirements of Federal Rule of Appellate Procedure 32(a)(6) because

this document has been prepared in a proportionally spaced typeface

using Word 2013 in 14-point Century Schoolbook.

/s/ *Keith D. Underkoffler*
Keith D. Underkoffler
Echo Aloe
Assistant Attorneys General
Counsel of Record
Environment, Natural
Resources, and Agriculture
Division
P.O. Box 30755
Lansing, MI 48909
(517) 335-7664
underkofflerk@michigan.gov
aloee1@michigan.gov

72

Daniel P. Bock
Special Assistant Attorney
General
Fahey Schultz Burzych Rhodes
PLC
4151 Okemos Road
Okemos, MI 48864
(517) 312-3130
dbock@fsbrlaw.com

73

## CERTIFICATE OF SERVICE

I certify that on May 4, 2026, the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record (designated below).

/s/ *Keith D. Underkoffler*
Keith D. Underkoffler
Echo Aloe
Assistant Attorneys General
Counsel of Record
Environment, Natural
Resources, and Agriculture
Division
P.O. Box 30755
Lansing, MI 48909
(517) 335-7664
underkofflerk@michigan.gov
aloee1@michigan.gov

Daniel P. Bock
Special Assistant Attorney
General
Fahey Schultz Burzych Rhodes
PLC
4151 Okemos Road
Okemos, MI 48864
(517) 312-3130
dbock@fsbrlaw.com

74

# DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

Defendants-Appellants, per Sixth Circuit Rule 28(a), 28(a)(1)-(2),

30(b), hereby designated the following portions of the record on appeal:

| Description of Entry | Date | Record Entry No. | PageID No. Range |
|---|---|---|---|
| Amended Complaint | 11/03/2025 | R.158 | PageID.2334-2399 |
| Answer and Affirmative Defenses | 06/24/2024 | R.110 | PageID.1048-1083 |
| Joint Statement of Material Facts | 04/05/2022 | R.67 | PageID.387-389 |
| State Officials' Motion to Abstain or Stay | 08/01/2025 | R.120 | PageID.1116-1117 |
| State Officials' Brief in Support of Motion to Abstain or Stay | 08/01/2025 | R.121 | PageID.1118-1554 |
| Enbridge's Motion for Summary Judgment | 08/01/2025 | R.124 | PageID.1562-1565 |
| Enbridge's Brief in Support of Motion for Summary Judgment | 08/06/2025 | R.128 | PageID.1607-1643 |
| Amicus Brief of Canada in Partial Support of Enbridge | 08/14/2025 | R.133 | PageID.1704-1754 |
| State Officials' Brief in Opposition to Enbridge's Motion for Summary Judgment | 09/05/2025 | R.134 | PageID.1755-1854 |

| Enbridge's Brief in Opposition to State Officials' Motion to Abstain or Stay | 09/05/2025 | R.135 | PageID.1855-1944 |
|---|---|---|---|
| Statement of Interest of the United States | 09/12/2025 | R.140 | PageID.2032-2063 |
| State Officials' Reply in Support of Motion to Abstain or Stay | 09/19/2025 | R.147 | PageID.2149-2211 |
| Enbridge's Reply in Support of Motion for Summary Judgment | 09/22/2025 | R.148 | PageID.2212-2231 |
| Enbridge's Response to the United States' Statement of Interest | 10/10/2025 | R.151 | PageID.2236-2240 |
| State Officials' Response to the United States' Statement of Interest | 10/10/2025 | R.152 | PageID.2241-2261 |
| Oral Argument Transcript | 11/14/2025 | R.160 | PageID.2401-2455 |
| Opinion and Order | 12/17/2025 | R.164 | PageID.2461-2505 |
| Judgment | 12/17/2025 | R.165 | PageID.2506 |
| Notice of Appeal | 01/06/2026 | R.166 | PageID.2507-2508 |

LF:  Enbridge Straits (Dec & Inj Relief) (v DNR) 6COA/LF# 2020-030646-D/Appellants' Brief 2026-05-04