No. 26-1021

# IN THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

Enbridge Energy, LP; Enbridge Energy Company, Inc.; Enbridge Energy Partners, L.P.,

Plaintiffs-Appellees

v.

Gretchen Whitmer, *the Governor of the State of Michigan in her official capacity;* Scott Bowen, *Director of the Michigan Department of Natural Resources in his official capacity,*

Defendants-Appellants.

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids
Case No. 1:20-cv-1141

## BRIEF OF AMICI CURIAE NORTH AMERICA'S BUILDING TRADES UNIONS AND UNITED STEELWORKERS, AFL-CIO-CLC IN SUPPORT OF PLAINTIFFS-APPELLEES

David R. Jury, General Counsel
UNITED STEELWORKERS
60 Boulevard of the Allies
Room 807
Pittsburgh, PA 15222
(412) 562-2545

*Counsel for United Steelworkers*

Jonathan D. Newman
Jacob J. Demree
Blake Phillips
SHERMAN DUNN, P.C.
900 Seventh Street, N.W.
Suite 1000
Washington, D.C. 20001
(202) 785-9300

*Counsel for North America's Building Trades Unions*

July 29, 2026

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 26-1021          Case Name: Enbridge Energy, LP v. Whitmer

Name of counsel: Jonathan D. Newman

Pursuant to 6th Cir. R. 26.1, North America's Building Trades Unions
                                            *Name of Party*
makes the following disclosure:

1.    Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

No.

2.    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

No.

## CERTIFICATE OF SERVICE

I certify that on _____ July 29, 2026 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Jonathan D. Newman
900 Seventh Street, N.W., Suite 1000
Washington, D.C. 20001

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

# 6th Cir. R. 26.1
## DISCLOSURE OF CORPORATE AFFILIATIONS
## AND FINANCIAL INTEREST

(a) **Parties Required to Make Disclosure**.  With the exception of the United States government or agencies thereof or a state government or agencies or political subdivisions thereof, all parties and amici curiae to a civil or bankruptcy case, agency review proceeding, or original proceedings, and all corporate defendants in a criminal case shall file a corporate affiliate/financial interest disclosure statement.  A negative report is required except in the case of individual criminal defendants.

(b) **Financial Interest to Be Disclosed.**

(1)  Whenever a corporation that is a party to an appeal, or which appears as amicus curiae, is a subsidiary or affiliate of any publicly owned corporation not named in the appeal, counsel for the corporation that is a party or amicus shall advise the clerk in the manner provided by subdivision (c) of this rule of the identity of the parent corporation or affiliate and the relationship between it and the corporation that is a party or amicus to the appeal.  A corporation shall be considered an affiliate of a publicly owned corporation for purposes of this rule if it controls, is controlled by, or is under common control with a publicly owned corporation.

(2) Whenever, by reason of insurance, a franchise agreement, or indemnity agreement, a publicly owned corporation or its affiliate, not a party to the appeal, nor an amicus, has a substantial financial interest in the outcome of litigation, counsel for the party or amicus whose interest is aligned with that of the publicly owned corporation or its affiliate shall advise the clerk in the manner provided by subdivision (c) of this rule of the identity of the publicly owned corporation and the nature of its or its affiliate's substantial financial interest in the outcome of the litigation.

(c) **Form and Time of Disclosure**.  The disclosure statement shall be made on a form provided by the clerk and filed with the brief of a party or amicus or upon filing a motion, response, petition, or answer in this Court, whichever first occurs.

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 26-1021              Case Name: Enbridge Energy, LP v. Whitmer

Name of counsel: David R. Jury

Pursuant to 6th Cir. R. 26.1, United Steelworkers
*Name of Party*

makes the following disclosure:

1.   Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

No.

2.   Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

No.

### CERTIFICATE OF SERVICE

I certify that on _____ July 29, 2026 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ David R. Jury
60 Boulevard of the Allies, Room 807
Pittsburgh, PA 15222

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

# 6th Cir. R. 26.1
## DISCLOSURE OF CORPORATE AFFILIATIONS
## AND FINANCIAL INTEREST

(a) **Parties Required to Make Disclosure**. With the exception of the United States government or agencies thereof or a state government or agencies or political subdivisions thereof, all parties and amici curiae to a civil or bankruptcy case, agency review proceeding, or original proceedings, and all corporate defendants in a criminal case shall file a corporate affiliate/financial interest disclosure statement. A negative report is required except in the case of individual criminal defendants.

(b) **Financial Interest to Be Disclosed.**

(1) Whenever a corporation that is a party to an appeal, or which appears as amicus curiae, is a subsidiary or affiliate of any publicly owned corporation not named in the appeal, counsel for the corporation that is a party or amicus shall advise the clerk in the manner provided by subdivision (c) of this rule of the identity of the parent corporation or affiliate and the relationship between it and the corporation that is a party or amicus to the appeal. A corporation shall be considered an affiliate of a publicly owned corporation for purposes of this rule if it controls, is controlled by, or is under common control with a publicly owned corporation.

(2) Whenever, by reason of insurance, a franchise agreement, or indemnity agreement, a publicly owned corporation or its affiliate, not a party to the appeal, nor an amicus, has a substantial financial interest in the outcome of litigation, counsel for the party or amicus whose interest is aligned with that of the publicly owned corporation or its affiliate shall advise the clerk in the manner provided by subdivision (c) of this rule of the identity of the publicly owned corporation and the nature of its or its affiliate's substantial financial interest in the outcome of the litigation.

(c) **Form and Time of Disclosure**. The disclosure statement shall be made on a form provided by the clerk and filed with the brief of a party or amicus or upon filing a motion, response, petition, or answer in this Court, whichever first occurs.

# TABLE OF CONTENTS

Corporate Disclosure Statements ................................................................

Table of Authorities...............................................................................ii

Statement of Interest ........................................................................ 1

Introduction.................................................................................... 4

Argument........................................................................................ 5

    I.    Abstaining or Staying This Litigation — or Otherwise Reversing the District Court — Will Imperil the Jobs, Wages, and Benefits of Thousands of Workers. .................... 5

        A.    The Court Should Exercise Its Jurisdiction. ................. 5

        B.    The Jobs, Wages, and Benefits of NABTU's and USW's Members Are at Risk. ...................................... 7

    II.    The Shutdown Order Is Preempted..................................... 16

        A.    The Transit Pipelines Treaty Expressly Preempts the Shutdown Order. ................................................. 16

        B.    The Shutdown Order Conflicts with Foreign Policy. ........................................................................ 20

Conclusion ................................................................................... 23

Certificate of Compliance .............................................................

Certificate of Service ...................................................................

# TABLE OF AUTHORITIES

**Cases**                                                   **Page(s)**

*Am. Ins. Ass'n v. Garamendi,*
539 U.S. 396 (2003) ....................................................................20-21

*Armstrong v. Exceptional Child Care Ctr., Inc.,*
575 U.S. 320 (2015) ........................................................................20

*Bunning v. Kentucky,*
42 F.3d 1008 (6th Cir. 1994) ............................................................6

*Chellman-Shelton v. Glenn,*
197 F. App'x 392 (6th Cir. 2006) (per curiam) ..............................6

*Colo. River Water Conservation Dist. v. United States,*
424 U.S. 800 (1976) .......................................................................5-6

*Crosby v. Nat'l Foreign Trade Council,*
530 U.S. 363 (2000) ........................................................................21

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,*
460 U.S. 1 (1983) ..............................................................................6

*United States v. Pink,*
315 U.S. 203 (1942) ........................................................................20

*Zschernig v. Miller,*
389 U.S. 429 (1968) ........................................................................20

**Other Authorities**

Agreement Concerning Transit Pipelines, Can.-U.S., Jan. 28,
1977, T.I.A.S. No. 8,720 ............................................... 5, 16-19, 21

Amicus Br. of the Gov't of Canada, *Bad River Band v. Enbridge
Energy Co.*, No. 23-2309 (7th Cir. Sept. 18, 2023)........................ 19

Br. of the United States as Amicus Curiae, *Bad River Band v.
Enbridge Energy Co.*, No. 23-2309 (7th Cir. Apr. 10, 2024).......... 19

Fed. R. App. P. 29(a)(2) ................................................................3

Fed. R. App. P. 29(a)(4)(E) ...........................................................3

Measure, *Black's Law Dictionary* (12th ed. 2024)........................18-19

Ohio Dep't of Com., *Prevailing Wage Portal*,
    https://pwr.com.ohio.gov/ (last visited July 28, 2026) ...................12

U.S. Const. art. VI........................................................................19-20

**STATEMENT OF INTEREST**

Workers represented by North America's Building Trades Unions ("NABTU") keep the Line 5 pipeline and associated facilities running, delivering energy sources throughout the Upper Midwest and Canada. NABTU is a labor organization composed of fourteen national and international unions and 327 provincial, state, and local building and construction trades councils representing more than three million workers. Thousands of those workers are employed in the pipeline and energy sector, including:

- Pipefitters and welders represented by the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada;

- Heavy equipment operators, mechanics, and surveyors represented by the International Union of Operating Engineers, who operate, maintain, and repair the equipment used on pipeline projects;

- Transportation workers represented by the International Brotherhood of Teamsters, who move material and people to, from, and around the sites where pipelines are built, repaired,

1

and maintained;

- Construction laborers represented by the Laborers International Union of North America, who clear rights of way, prepare jobsites, place pipes, and restore the landscape after the pipeline is buried; and

- Electricians represented by the International Brotherhood of Electrical Workers, who work at pumping and service stations along pipelines to ensure that the instruments, valves, gauges, pumps, and motors operate properly.

Members of all of NABTU's affiliates also perform critical maintenance and repair of facilities that rely on pipelines like the Line 5 pipeline at issue in this case, including refineries that refine crude oil and fractionators that separate propane and butane from natural gas liquids.

The United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO-CLC ("United Steelworkers" or "USW") represents approximately 500,000 members in the United States, Canada, and the Caribbean in numerous industrial and other sectors. In the energy sector, USW represents employees working in oil refineries, as well as

those involved in maintaining and constructing pipelines. USW is the largest union in the American refining industry, representing production and maintenance workers at dozens of refining, production, pipeline, maintenance, storage, and petrochemical facilities in the United States — facilities that together represent roughly two-thirds of the nation's refining capacity. USW represents workers in refineries that are fed by Line 5 and whose employment would be jeopardized if Line 5 were closed.

NABTU and USW have a strong interest in this case, which could determine the future employment and well-being of thousands of their members. They file this brief under Federal Rule of Appellate Procedure 29(a)(2).

All parties have consented to the filing of this brief. Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), NABTU, USW, and their counsel declare that: (1) no party's counsel authored this brief in whole or in part; (2) no party or party's counsel contributed money to fund the preparation or submission of the brief; and (3) no person other than NABTU and USW, their members, and their counsel has contributed money to fund the preparation or submission of the brief.

## INTRODUCTION

The Line 5 pipeline was built over seventy years ago and continues to transport critical energy sources between the United States and Canada. Thousands of NABTU's and USW's members keep the pipeline operating, putting in over a million hours of work each year to maintain the pipeline and associated industrial facilities.

Michigan wants to shut down part of Line 5 (the Straits Pipelines). That would endanger the employment and livelihoods of thousands of workers and their families, along with millions of dollars of family-sustaining wages and benefits. Michigan's attempts have led to a flurry of state and federal litigation, including *Nessel v. Enbridge* (which continues in state court), *Michigan v. Enbridge* (which was filed in state court, removed, and ultimately dismissed), and this case (which was filed in federal court). In *Nessel*, the court is deciding whether the 1953 easement allowing Plaintiffs-Appellees (together, "Enbridge") to operate the Straits Pipelines is valid, as well as other state-law claims. In this case, the district court had to decide more broadly whether Michigan could enforce a 2020 Shutdown Order or otherwise interfere with Line 5's operations.

The district court found that attempts to interfere with Line 5's operations were preempted by the Pipeline Safety Act of 1992, by a treaty between the United States and Canada concerning the transportation of hydrocarbons between the two countries, and by the Foreign Affairs Doctrine. Defendants-Appellants Governor Gretchen Whitmer and Director Scott Bowen believe the district court was wrong on the merits and should have abstained from even considering the merits. This brief focuses on the abstention issue and also preemption through operation of the Transit Pipelines Treaty and the Foreign Affairs Doctrine.

## ARGUMENT

**I. Abstaining or Staying This Litigation — or Otherwise Reversing the District Court — Will Imperil the Jobs, Wages, and Benefits of Thousands of Workers.**

### A. *The Court Should Exercise Its Jurisdiction.*

Governor Whitmer and Director Bowen argue that the district court should have declined to reach Enbridge's preemption claims "under established principles of constitutional avoidance." Opening Br. 69. But federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them," even if those cases address constitutional issues. *Colo. River Water Conservation Dist. v. United States*, 424 U.S.

800, 817 (1976). Abstention — deciding not to exercise jurisdiction — "is the exception, not the rule," and is allowed only in narrow circumstances. *Id.* at 813.

The mere existence of a parallel state proceeding is not enough to require abstention or a stay. In deciding whether to abstain, this Court must balance "the strong federal interest" in having preemption challenges resolved in federal court against the state's interests. *Chellman-Shelton v. Glenn*, 197 F. App'x 392, 394 (6th Cir. 2006) (per curiam). The balance is "heavily weighted in favor of the exercise of jurisdiction." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 16 (1983). If there is "any substantial doubt" that the state-court proceeding "will be an adequate vehicle for the complete and prompt resolution of the issues between the parties," "it would be a serious abuse of discretion to grant the stay or dismissal." *Id.* at 28.

Abstention is *not* required "in a case presenting facially conclusive claims of federal preemption, where resolution of the dispute does not require the court to interpret state law or make factual findings." *Bunning v. Kentucky*, 42 F.3d 1008, 1011 (6th Cir. 1994). Here, the only question before the Court is whether Michigan's actions are preempted

by federal law.  The Court does not have to determine any questions of state law or make any factual findings.  Instead, the Shutdown Order means precisely what it says:  "Enbridge must cease operation of the Straits Pipelines . . . ."  Shutdown Order, R.1-1, PageID.22.  If valid, the Shutdown Order would interfere with Enbridge's operation of the Line 5 pipeline.

Though the state court in *Nessel* is evaluating the validity of the 1953 easement, *see* State Compl., R.121-3, PageID.1162, and other state-law claims, *see id.* PageID.1179-81, the issues in that case are separate from the preemption issue in this case.  In this case, Enbridge is seeking "to enjoin Defendants from taking any steps to enforce the Shutdown Order *or to otherwise interfere with operations on Line 5*."  Am. Compl., R.158, PageID.2346 (emphasis added).  That relief is broader than the relief sought in *Nessel*.  In other words, if Michigan lost *Nessel*, nothing would prevent Michigan from attempting other methods to interfere with operations on Line 5 — absent a decision in *this* case.

**B.  The Jobs, Wages, and Benefits of NABTU's and USW's Members Are at Risk.**

Without a decision preventing Michigan from interfering with Line 5's operation, the livelihoods of NABTU's and USW's members are at

risk. Staying or abstaining here, or otherwise reversing the district court's decision, will impact the thousands of NABTU and USW members that operate and maintain the Line 5 pipeline and its associated industrial facilities.

Line 5 has transported energy sources through Wisconsin and Michigan and Ontario, Canada, for over seven decades. Refineries in Michigan, Ohio, Pennsylvania, Ontario, and Quebec depend on the crude oil Line 5 delivers, and facilities in Wisconsin, Michigan, and Ontario rely on Line 5 to provide natural gas liquids ("NGLs") to produce propane and butane essential to meeting consumer heating demands in those and other jurisdictions.

For members of the building and construction trades, the work associated with Line 5 falls into two basic categories: (1) maintaining the current pipeline, and (2) servicing the heavy industry Line 5 supports. Along Line 5's route, Enbridge operates pump stations and other facilities that NABTU members routinely service. Workers ensure that pressure gauges and pumps are operating properly, and they repair and replace equipment as needed. These workers also monitor Line 5 itself — inspecting the pipeline and its structural components (including

its supports) for problems like corrosion, dents, and cracks, and making necessary repairs, which can include anything from reinforcing a portion of pipe to full-scale replacement of a pipe segment. Line 5 further supports thousands of jobs in facilities that process and use crude oil and NGLs, including refineries and fractionators.

Line 5 begins at its main terminal in Superior, Wisconsin, where USW represents approximately 140 Enbridge production and maintenance employees. Traversing Michigan, Line 5 is the exclusive source of NGLs to a fractionator in Rapid River, Michigan, which is the primary source of propane for the Upper Peninsula. The pipeline also provides nearly 30% of the crude processed by Marathon Oil's Detroit facility.

Crude oil transported by Line 5 reaches two Ohio refineries, as well: PBF Energy Toledo and the Cenovus Refinery. USW represents approximately 375 production and maintenance and office and technical employees at PBF Energy's Toledo Refinery, and 325 process, production, and maintenance employees at the Cenovus Refinery (formerly known as the bp-Husky Toledo Refinery).

In Canada, Line 5 is the major source of product to Sarnia, Ontario's

vast industrial base. Line 5 is the only existing, feasible transportation mode to provide NGLs to Plains Midland Canada's Sarnia fractionator, which produces butane and propane. Line 5 crude oil also reaches Imperial Oil's Sarnia operations (a complex consisting of a refinery, chemical plant, and petroleum research facility), the Suncor Sarnia refinery, and the Shell Sarnia refinery. Line 5 feeds pipelines that support the Imperial Nanticoke refinery in Ontario, the Suncor Montreal and Valero Levis refineries in Quebec, and United Refining's facility in Warren, Pennsylvania.

These are all large facilities, covering acres of land and housing a web of complex, heavy machinery that must operate consistently and, except in the case of required maintenance, without interruption to provide the energy and fuel needed to meet consumer demand. The skilled building trades workers represented by NABTU's affiliates constantly monitor, maintain, and repair this equipment in facilities across the Upper Midwest and in Canada. These workers are employed on an ongoing basis in these facilities, and thousands of others are brought in on an as-needed or regularly scheduled basis when the plants are completely shut down for full-scale equipment overhauls.

If Line 5 ceased operation, the refineries in Michigan, Ohio, Ontario, Quebec, and Pennsylvania that depend on the products the pipeline carries would either have to significantly reduce production or close down completely. In either case, the impact on workers who depend on Line 5 for their employment would be dramatic.

Take just the two Ohio refineries. Data collected by NABTU's affiliated unions shows that in 2024, their members performed 1,373,299 hours of routine and large-scale maintenance at the PBF Energy and Cenovus refineries in Toledo, Ohio. That's approximately equivalent to full-time employment for nearly seven hundred workers, which is in addition to the production and other maintenance work performed by USW members employed directly at these facilities.[1]

Wage rates vary by trade and by experience level, but for

---

[1] Because many construction trades workers often work intermittently, moving from job to job and employer to employer, and because wages and benefits are paid and reported on an hourly basis, employment in the industry is commonly tracked through hours of work rather than numbers of individual workers. Assuming the reported hours reflect full-time employment (forty hours a week for fifty weeks in a year), these numbers represent work for 687 individuals. However, while the employees performing routine maintenance are likely employed on an ongoing basis in these refineries, many more are brought in for large-scale, short-term projects.

perspective, the prevailing hourly wage for building trades workers in Lucas County (the site of the refineries) starts at $53.00 for pipefitters, $40.24 for operating engineers (or more, depending on the type of equipment used), $25.58 for laborers, and $46.54 for electricians.[2]  At those rates, losing 1,373,299 hours of work would translate into a loss of between $35.1 million and $72.8 million in wages at the Ohio refineries alone.

Shutting down Line 5 would have a similarly devastating effect on the refinery workers USW represents.  It is highly unlikely they would be able to find jobs with similar wage, benefit, and retirement savings structures elsewhere in their regional economy following a disruption in supply to the Toledo refineries.  The threats of disruption are tangible, and the potential for a replacement means of transporting the crude oil to the refineries is, at best, highly speculative.

The light crude oil Line 5 supplies to PBF Energy's Toledo Refinery is primarily refined into jet fuel that supplies the bulk of the fuel for the

---

[2]    Prevailing wage and benefit rates for each craft are available at Ohio Dep't of Com., *Prevailing Wage Portal*, https://pwr.com.ohio.gov/ (last visited July 28, 2026).

Detroit Metro Airport. PBF Energy's Toledo Refinery processes approximately 189,000 barrels per day, or the equivalent of 900 to 1,000 tanker truck loads. There are currently no viable alternative sources of crude oil for this facility, as its location lacks the infrastructure to receive the needed supply by rail or truck. For that reason, it is almost certain that if Line 5 were shut down, the production and maintenance employees at that facility would lose their jobs. Those are good-paying, family-sustaining jobs (with straight-time hourly wage rates ranging from $53.41 to $61.53 for senior production and maintenance employees) that allow USW members to contribute to the economic vitality of Toledo and its surrounding communities.

The Cenovus Toledo Refinery likewise receives crude oil transported on Line 5. Should Line 5 be shut down, Cenovus would need to locate an alternative source for crude oil, and even if the facility did not close altogether, its operations would be disrupted, and with it, the financial stability of USW's members, whose straight-time hourly rates for senior employees range from $48.45 to $59.22 per hour.

For NABTU's affiliates' members, job loss means more than lost income. In the construction industry, unions negotiate collective

bargaining agreements with multiemployer contracting groups to ensure that as the workers move from job to job and contractor to contractor, they work under similar conditions and accrue benefits that travel with them. These agreements require employers to pay hourly wages commensurate with the employees' skills *and* to contribute to jointly-trusteed employee benefit funds that pool the contributions for the benefit of all workers employed under the multiemployer contract. These funds provide employees with health insurance and pension benefits and finance the building trades' robust training programs.

Entitlement to these vital benefits and the amount an employer is required to pay out depend on the availability of work and the number of hours worked. For example, workers often must work some minimum number of hours during a specified period to be eligible for health insurance. Retirement benefits are also computed based on hours worked, so any break in employment reduces the resources a worker can expect to rely on in retirement. Moreover, the overall viability of the benefit funds covering these workers depends on the amount of work available in the area over time.

Returning to the Toledo refineries, the prevailing hourly benefit

contribution rates in Lucas County are $33.56 for pipefitters, $17.45 for operating engineers, $17.80 for laborers, and $29.94 for electricians. That means the potential closure of the two Toledo refineries would place between $24 million and $46.1 million in benefit contributions in jeopardy. That amounts to a total of between ***$59.6 million and $118.9 million*** in potentially lost wages and benefits at just the Ohio refineries. Many of NABTU's affiliates' members would struggle to find comparable work in the same geographic area, straining these workers and their families, as well as the area's overall social safety net.

This level of dislocation would threaten the construction industry's ability to train for the future. The trades and their signatory contractors fund and operate a vast network of apprenticeship and other training programs. Because the programs are financed by contributions based on hours worked under the parties' collective bargaining agreements, their financial viability depends on the availability of work. But so too does the training, the heart of which is the ability to merge classroom and on-the-job instruction. Without jobs to staff, the vital on-the-job training element disappears, threatening the building trades' ability to bring new workers into industries that could provide them with solid and

sustainable, well-paying careers.

The situation is the same in all the facilities that depend on Line 5. Sudden closures of the pipeline threaten catastrophic losses of good-paying, middle-class jobs that provide skilled workers in the United States and Canada with consistent employment, health insurance, pensions, and other benefits, and opportunities for the next generation of working people to achieve the same.

## II. The Shutdown Order Is Preempted.

### A. *The Transit Pipelines Treaty Expressly Preempts the Shutdown Order.*

Article II, Section 1 of the Transit Pipelines Treaty provides that, "[n]o public authority in the territory of either Party shall institute any measures . . . which are intended to, or which would have the effect of, impeding, diverting, redirecting or interfering with in any way the transmission of hydrocarbons in transit." Agreement Concerning Transit Pipelines, Can.-U.S., art. II, § 1, Jan. 28, 1977, T.I.A.S. No. 8,720 ("Transit Pipelines Treaty"). By permanently shutting down the Straits Pipelines, the Shutdown Order will impede the transmission of hydrocarbons in transit.

The treaty includes exceptions, but they do not apply here. Article

16

IV allows parties to the treaty to implement pipeline construction and operation standards and environmental protection rules. But those standards and rules "shall always . . . be applied equally to all persons and in the same manner." Transit Pipelines Treat art. IV, § 2. Here, the Shutdown Order applies *specifically* to the Straits Pipelines. It "[r]evokes" and "[t]erminates the 1953 Easement," and "[r]equires Enbridge to cease operation of" and "permanently decommission the Straits Pipelines." Shutdown Order, R.1-1, PageID.41. The Shutdown Order does not apply to any other pipeline — it is not a standard or rule applied equally to all pipelines running through the State of Michigan.

Article V, Section 1 of the treaty allows the parties "temporarily to reduce or stop for safety or technical reasons the normal operation of a Transit Pipeline" "[i]n the event of an actual or threatened natural disaster, an operating emergency, or other demonstrable need." But the Shutdown Order is not temporary. It finally and permanently revokes the 1953 easement and requires Enbridge to cease operation of the Straits Pipeline. Shutdown Order, R.1-1, PageID.41.

And Article II, Section 3 requires the parties to "facilitate the expeditious issuance of such permits, licenses, or other authorizations as

may be required from time to time for the import into, or export from, its territory . . . of hydrocarbons." The Shutdown Order does not fit this description. It does not permit, license, or authorize the passage of hydrocarbons "from time to time"; it stops their passage permanently. Shutdown Order, R.1-1, PageID.41. Nor is it facilitated by a party to the agreement, both of whom oppose it. *See* Statement of Interest of the United States, R.140, PageID.2037-38; Br. of Amicus Curiae Gov't of Canada, R.133, PageID.1713-14

Governor Whitmer and Director Bowen argue that the Shutdown Order does not constitute a "measure" under the Transit Pipelines Treaty. Citing *Black's Law Dictionary*, they assert that a measure is a "course of action proposed or taken by a government, such as a legislative bill or an executive action." Opening Br. 63. But the Shutdown Order *is* a "course of action . . . taken by a government" — it is "an executive action" signed by Governor Whitmer and Director Bowen. Moreover, the full definition of "measure" is: "An action or procedure intended as a means to an end or with a view to accomplishing a purpose; specif., a course of action proposed or taken by a government, such as a legislative bill or an executive action." Measure, *Black's Law Dictionary* (12th ed.

2024). The Shutdown Order is undoubtedly an action "intended as a means to an end or with a view to accomplishing a purpose": closing the Straits Pipeline. By shutting down the Straits Pipeline, the Shutdown Order will "imped[e] . . . the transmission of hydrocarbons in transit." Transit Pipelines Treaty art. II, § 1. Therefore, the Shutdown Order is preempted by the Transit Pipelines Treaty.

Governor Whitmer and Director Bowen argue that Enbridge does not have a right of action under the Transit Pipelines Treaty. But Enbridge is not asking the Court to enforce the treaty. The Transit Pipelines Treaty is self-executing and binding, as both the United States and Canada have recognized. *See* Br. of the United States as Amicus Curiae, *Bad River Band v. Enbridge Energy Co.*, No. 23-2309, at 30 n.5 (7th Cir. Apr. 10, 2024); Amicus Br. of the Gov't of Canada, *Bad River Band*, No. 23-2309, at 12 (7th Cir. Sept. 18, 2023).

Rather than seeking to enforce the treaty, Enbridge is merely asking the Court to exercise its settled jurisdiction to protect Enbridge from state regulation preempted by federal law, i.e., preempted by the Transit Pipelines Treaty. U.S. Const. art. VI (The "Constitution, and the Laws of the United States which shall be made in Pursuance thereof; *and*

*all Treaties made, or which shall be made, under the Authority of the United States*") (emphasis added); *see Armstrong v. Exceptional Child Care Ctr., Inc.*, 575 U.S. 320, 326 (2015).

### B. The Shutdown Order Conflicts with Foreign Policy.

The Foreign Affairs Doctrine similarly preempts the Shutdown Order. "[T]he Constitution entrusts [the foreign affairs of the United States] solely to the Federal Government . . . ." *Zschernig v. Miller*, 389 U.S. 429, 436 (1968). Stated differently, "[p]ower over external affairs is . . . vested in the national government exclusively." *United States v. Pink*, 315 U.S. 203, 233 (1942). The Foreign Affairs Doctrine prohibits states from taking an "action with more than incidental effect on foreign affairs" and intruding upon the exclusive authority of the federal government over foreign affairs. *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 418 (2003).

In *Garamendi*, California passed a law requiring any insurer doing business in the state to disclose details of insurance policies in effect between 1920 and 1945 and issued to persons in Europe. But that law conflicted with agreements between the United States and the governments of Germany and Austria. Those agreements provided

victim compensation funds and a process for handling claims related to the Nazi Government of Germany's theft of insurance policies held by Jewish citizens in Europe. The Supreme Court found that "the national position, expressed unmistakably in the executive agreements signed by the President with Germany and Austria, has been to encourage European insurers to work with [an organization set up to process claims] to develop acceptable claim procedures." 539 U.S. at 421. California's law "compromise[d] the very capacity of the President to speak for the Nation with one voice in dealing with other governments," so the law was preempted by the Foreign Affairs Doctrine. *Id.* at 424 (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 381 (2000)).

Here, Michigan's attempt to shut down the Straits Pipelines is a "state action with more than incidental effect on foreign affairs [and] is preempted." *Garamendi*, 539 U.S. at 418. The Shutdown Order would completely halt the transport of thousands of barrels of hydrocarbons a day between the United States and Canada — precisely what Article II of the Transit Pipelines Treaty declares unlawful in all but the most exigent circumstances. If Michigan is successful, the United States "could be exposed to liability for significant damages." Statement of

21

Interest of the United States, R.140, PageID.2060. Both the United States and Canada have declared that such a shutdown is directly antithetical to their foreign policies. *See id.* PageID.2037-38; Br. of Amicus Curiae Gov't of Canada, R.133, PageID.1713-14. It is hard to imagine an action with a more direct effect on foreign affairs than one that openly violates the terms of, may subject the United States to liability under, and openly flouts the foreign policies of both signatories to a treaty. The Shutdown Order conflicts with United States foreign policy and is therefore preempted by the Foreign Affairs Doctrine.

# CONCLUSION

This Court should affirm the district court's decision.

Respectfully submitted,

/s/ Jonathan D. Newman

David R. Jury, General Counsel
UNITED STEELWORKERS
60 Boulevard of the Allies
Room 807
Pittsburgh, PA 15222
(412) 562-2545
djury@usw.org

*Counsel for United Steelworkers*

Jonathan D. Newman
Jacob J. Demree
Blake Phillips
SHERMAN DUNN, P.C.
900 Seventh Street, N.W.
Suite 1000
Washington, D.C. 20001
(202) 785-9300
newman@shermandunn.com
demree@shermandunn.com
phillips@shermandunn.com

*Counsel for NABTU*

July 29, 2026

## CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of Rule 29(a)(5) because, excluding the parts of the document exempted by Rule 32(f) and Local Rule 32(b)(1), it contains 4,152 words.

2. This document complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word 365 in Century Schoolbook font and fourteen-point type.

/s/ Jonathan D. Newman
Jonathan D. Newman
SHERMAN DUNN, P.C.
900 Seventh Street, N.W.
Suite 1000
Washington, D.C. 20001
(202) 785-9300
newman@shermandunn.com

## CERTIFICATE OF SERVICE

I certify that on July 29, 2026, this brief was filed using the Court's CM/ECF system. All attorney participants in the case are registered CM/ECF users and will be served electronically via that system.

/s/ Jonathan D. Newman
Jonathan D. Newman
SHERMAN DUNN, P.C.
900 Seventh Street, N.W.
Suite 1000
Washington, D.C. 20001
(202) 785-9300
newman@shermandunn.com