No. 26-1021

In the
UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

ENBRIDGE ENERGY, LP; ENBRIDGE ENERGY COMPANY, INC., AND ENBRIDGE ENERGY PARTNERS, L.P.,

Plaintiffs-Appellees,

v.

GRETCHEN WHITMER, the Governor of the State of Michigan in her official capacity, and SCOTT BOWEN, Director of the Michigan Department of Natural Resources in his official capacity,

Defendants-Appellants.

Appeal from the United States District Court
Western District of Michigan, Southern Division
Honorable Robert J. Jonker

# REPLY BRIEF FOR DEFENDANTS-APPELLANTS

Keith D. Underkoffler
Echo Aloe
Assistant Attorneys General
Counsel of Record
Environment, Natural Resources, and Agriculture Division
P.O. Box 30755
Lansing, MI 48909
(517) 335-7664

Daniel P. Bock
Special Assistant Attorney General
Fahey Schultz Burzych Rhodes PLC
4151 Okemos Road
Okemos, MI 48864
(517) 312-3130

*Counsel for Defendants-Appellants*

Dated: August 28, 2026

## TABLE OF CONTENTS

Page

Table of Authorities .......... iii

Glossary .......... ix

Introduction .......... 1

Argument .......... 1

I. The PSA does not prohibit Michigan from exercising its property and contract rights. .......... 1

A. Interstate oil pipelines must be sited on valid easements and confined to the easements' terms. .......... 1

B. The PSA preempts enacting regulations, not exercising property rights. .......... 3

C. The PSA does not prohibit revoking the easement as void from inception. .......... 5

D. The PSA does not prohibit exercising the easement's termination clause. .......... 6

1. Private landowners may enforce conditions in easement contracts .......... 6

2. Congress did not intend to treat state landowners worse than private landowners. .......... 8

3. The PSA does not retroactively preempt design standards. .......... 11

4. *If* the PSA preempts the easement's essential terms, the entire contract fails. .......... 13

E. Enbridge's counterarguments lack merit. .......... 13

1. The PSA does not preempt motives. .......... 13

2. Enbridge's cases are inapposite. .... 16

3. The PSA does not preempt remedies. .... 19

4. Enbridge's consequentialist arguments are misplaced. .... 20

II. Neither the Foreign Affairs Doctrine nor the 1977 Treaty preempts the Notice. .... 23

A. The Notice cannot be preempted by mere policy or incidental impacts on foreign relations. .... 23

B. Enbridge has no standing or right of action to bring a Treaty-based preemption claim. .... 26

C. The Court cannot find Treaty-based preemption without interpreting the Treaty. .... 28

D. The Treaty does not preempt the Notice. .... 29

III. The district court erred by unnecessarily deciding the constitutional preemption questions in this case. .... 34

Conclusion and Relief Requested .... 35

Certificate of Compliance .... 36

Certificate of Service .... 38

## TABLE OF AUTHORITIES

Page

**Cases**

*Am. Ins. Ass'n v. Garamendi*,
539 U.S. 396 (2003) .......... 28, 29, 30

*Am. Trucking Ass'ns v. City of Los Angeles*,
569 U.S. 641 (2013) .......... 10

*ANR Pipeline Co. v. Iowa State Commerce Comm'n*,
828 F.2d 465 (8th Cir. 1987) .......... 20

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015) .......... 33

*Asakura v. City of Seattle*,
265 U.S. 332 (1924) .......... 35

*Ashwander v. TVA*,
297 U.S. 288 (1936) .......... 43

*Bad River Band of the Lake Superior Tribe of Chippewa Indians of the Bad River Reservation v. Enbridge Energy Co.*,
--- F.4th ---, 2026 WL 2198120, (7th Cir. July 30, 2026) .......... passim

*Bad River v. Enbridge*,
626 F. Supp. 3d 1030 (W.D. Wis. 2022) .......... 19

*Bond v. United States*,
572 U.S. 844 (2014) .......... 39

*Building & Constr. Trades Council v. Associated Builders & Contractors of Mass./R.I., Inc.*,
507 U.S. 218 (1993) .......... 10

*Clark v. Dalman*,
150 N.W.2d 755 (Mich. 1967) .......... 11

*Couser v. Shelby County*,
139 F.4th 664 (8th Cir. 2025) .......... 21

*Delassus v. United States*,
34 U.S. 117 (1835) .......... 40

*Enbridge Energy, LP v. Whitmer*,
135 F.4th 467 (6th Cir. 2025) .......... 14

*Head v. Strange*,
127 F.4th 630 (6th Cir. 2025) .......... 36

*Hencely v. Fluor Corp.*,
146 S.Ct. 1086 (2026) .......... 31

*Holder v. Humanitarian L. Project*,
561 U.S. 1 (2010) .......... 29

*Kansas v. Garcia*,
589 U.S. 191 (2020) .......... 31

*Kia Motors Am., Inc. v. Glassman Oldsmobile Saab Hyundai, Inc.*,
706 F.3d 733 (6th Cir. 2013) .......... 14

*Kinley Corp. v. Iowa Utilities Bd.*,
99 F.2d 354 (8th Cir. 1993) .......... 16, 20

*Landgraf v. USI Film Prods.*,
511 U.S. 244 (1994) .......... 14

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) .......... 28

*Loretto v. Teleprompter Manhattan CATV Corp.*,
458 U.S. 419 (1982) .......... 9

*Martin v. Creasy*,
360 U.S. 219 (1959) .......... 42

*Medellín v. Texas*,
552 U.S. 491 (2008) .......... 30, 31, 32, 34

*Mich. Corr. Org. v. Mich. Dep't of Corr.*,
774 F.3d 895 (6th Cir. 2014) .................................................. 33, 34, 35

*Murphy v. Dep't Nat'l Res.*,
837 F. Supp. 1217 (S.D. Fla. 1993) ......................................................6

*Muskegon Theaters, Inc. v City of Muskegon*,
507 F.2d 199 (6th Cir. 1974) ..............................................................42

*Niz-Chavez v. Garland*,
593 U.S. 115 (2021) ............................................................................26

*Olympic Pipe Line Co. v. City of Seattle*,
437 F.3d 872 (9th Cir. 2006) .........................................................21, 22

*Olympic Pipe Line Co. v. City of Seattle*, C03-2343L,
2003 WL 27392855 (W.D. Wash. Aug. 21, 2003)................................23

*PCS Phosphate Co., Inc. v. Norfolk So. Corp.*,
559 F.3d 212 (4th Cir. 2009) ..............................................................13

*People's Pass. Co. of Memphis v. Memphis City R. Co.*,
77 U.S. 38 (1869) ................................................................................22

*Saleh v. Titan Corp.*,
580 F.3d 1 (D.C. Cir. 2009) ................................................................31

*Seminole Tribe of Fla. v. Florida*,
517 U.S. 44 (1996) ..............................................................................34

*SFPP, L.P. v. Union Pac. R.R. Co.*,
274 F. App'x 549 (9th Cir. 2008) ............................................... 8, 11, 12

*Sprint Spectrum L.P. v. Mills*,
283 F.3d 404 (2d Cir. 2002).........................................................12, 13

*Strother v. Lucas*,
37 U.S. 410 (1838) ..............................................................................40

*Superior Communications v. City of Riverview*,
881 F.3d 432 (6th Cir. 2018) .........................................................12, 13

*Sutera v. Go Jokir, Inc.*,
86 F.3d 298 (3d Cir. 1996)....................11

*Tarrant Reg'l Water Dist. v. Hermann*,
569 U.S. 614 (2013)....................32

*Texas & P. Ry. Co. v. City of El Paso*,
85 S.W.2d 245 (Tex. 1935)....................22

*Texas v. Dep't of Homeland Security*,
123 F.4th 186 (5th Cir. 2024)....................10

*Thompson v. Schenectady Ry. Co.*,
124 F. 274 (N.D.N.Y. 1903)....................22

*Torres v. Precision Indus., Inc.*,
938 F.3d 752 (6th Cir. 2019)....................42, 43

*Trump v. Cook*,
146 S.Ct 2234 (2026)....................33

*Turkiye Halk Bankasi A.S. v. United States*,
598 U.S. 264 (2023)....................26

*United States v. Percheman*,
32 U.S. 51 (1833)....................40

*United States v. Stoeco Homes, Inc.*,
498 F.2d 597 (3d Cir. 1974)....................6

*United States v. Stuart*,
489 U.S. 353 (1989)....................36

*Virginia Uranium, Inc. v. Warren*,
587 U.S. 761 (2019)....................18

*Williams Pipe Line Co. v. City of Mounds View*,
651 F. Supp. 551 (D. Minn. 1987)....................20, 21

**Statutes**

15 U.S.C. §717(h) ........ 2

49 U.S.C. §10501(b) ........ 19

49 U.S.C. §60102 ........ 4

49 U.S.C. §§60102(a)-(b) ........ 4

49 U.S.C. §60102(a)(2) ........ 9

49 U.S.C. §60102(a)(2)(A) ........ 6

49 U.S.C. §60102(a)(2)(B) ........ 6

49 U.S.C. §60102(b)(1)(B)(ii) ........ 14

49 U.S.C. §60104(b) ........ 12

49 U.S.C. §60104(c) ........ 4, 15, 19

49 U.S.C. §60105(b)(1) ........ 4

49 U.S.C. §60115 ........ 4

49 U.S.C. §60120(c) ........ 19

49 U.S.C. §60121(a) ........ 19

49 U.S.C. §60121(d) ........ 19

**Other Authorities**

28 U.S.T. 7449 ........ 28, 30

36 Am. Jur. 2d Franchises from Public Entities ........ 18

49 N.Y. Jur. 2d Easements ........ 18

*Est. of Min. Safety Stds.*,
35 Fed. Reg. 13,248 (Aug. 19, 1970) ........ 9

May 28, 2014 PHMSA Letter ........ 14

Peggy Kirk Hall, et al., *Understanding and Negotiating Pipeline Easements*, Ohio State Univ. Extension (May 23, 2016) .................. 7, 9

PIPA Recommended Practice BL07 ......................................................... 9

Rafael G. Mora, *et al.*, *Pipeline Integrity Management Systems: A Practical Approach* (ASME Press 2016) ............................................... 5

S. Exec. Rep. No. 95-9 ........................................................... 31, 32

*The American Heritage Dictionary of the English Language* (1969) ....... 4

**Regulations**

49 C.F.R. pt.195 ......................................................................... 4

**Constitutional Provisions**

U.S. Const., art.VI, cl.2, amend. X ........................................................ 26

## GLOSSARY

| Term | Definition |
|---|---|
| FERC | Federal Energy Regulatory Commission |
| MDNR | Michigan Department of Natural Resources |
| NGA | Natural Gas Act, 15 U.S.C. ch.15B, §§717 *et seq*. |
| Notice | Notice of Revocation and Termination of Easement (R.158, PageID.2352-2385) |
| PHMSA | Pipeline and Hazardous Materials Safety Administration |
| PSA | Pipeline Safety Act, 49 U.S.C. ch.601., §§ 60101 *et seq*. |
| SLA | Submerged Lands Act, 43 U.S.C. ch.29, §§1311 *et seq*. |
| Treaty | Agreement Concerning Transit Pipelines, Can.-U.S., Jan. 28, 1977, 28 U.S.T. 7449 |

## INTRODUCTION

Enbridge's brief is heavy on policy and light on law. It scarcely engages with the State Officials' arguments. Instead, Enbridge seeks to lock in the benefits of the 1953 easement in perpetuity—while evading its own obligations—based on hyperbolic claims about the centrality of its pipelines to "American life as we know it," the alleged "motivation" of various state actors, and "the policy" supposedly "embodied in" two federal laws. Enbridge is wrong: neither the Pipeline Safety Act (PSA), the Foreign Affairs Doctrine, nor the 1977 Treaty entitles it to use Michigan's land without consent or a valid easement.

## ARGUMENT

### I. The PSA does not prohibit Michigan from exercising its property and contract rights.

#### A. Interstate oil pipelines must be sited on valid easements and confined to the easements' terms.

Enbridge argues that, because there are national interests in oil, the federal government must control everything related to the interstate pipeline system. (Enbridge Br., Dkt.37, pp.2, 21-23, 25, 31,

43-44.) As a policy matter, that approach has downsides.[1] As a legal matter, it is inconsistent with the PSA.

Congress knows how to enact the sort of scheme Enbridge desires when it wants to. In a different statute—the Natural Gas Act (NGA)—Congress empowered the Federal Energy Regulatory Commission (FERC) to grant "the necessary right-of-way to construct, operate, and maintain" a natural gas pipeline. 15 U.S.C. §717(h). But for oil pipelines—like Line 5—Congress chose a different tack. No federal agency has the power to grant rights-of-way for oil pipelines.[2] Instead, operators *must* negotiate with landowners (or use *state* eminent domain procedures) to obtain the property rights needed to construct, operate, and maintain an oil pipeline on another person's land. The formation of these contracts, and the remedies for breach, are governed by state law.

The Seventh Circuit recently underscored the importance of obtaining valid land rights. When Enbridge's rights-of-way to operate

---

[1] *E.g.*, Preemption Scholars Br., Dkt.26, p.8 ("States and local governments...have far more expertise regarding their local geography and needs."); Bus. Network Br., Dkt.15, p.26 ("PHMSA has historically suffered from near-complete industry capture").

[2] As Enbridge notes, PHMSA can enact *minimum safety standards* that pertain to rights-of-way. (Enbridge Br., Dkt.37, pp.24, 37.) But PHMSA can't *grant* a right-of-way or dictate the terms in the easement.

Line 5 on parcels of tribal land in Wisconsin expired, the Bad River Band refused to renew them, expressing concerns about Enbridge's release of "over 1 million gallons of crude oil into a tributary of the Kalamazoo River in Michigan." *Bad River Band of the Lake Superior Tribe of Chippewa Indians of the Bad River Reservation v. Enbridge Energy Co.*, --- F.4th ---, 2026 WL 2198120, *4 (7th Cir. July 30, 2026). The Seventh Circuit held that Enbridge willfully trespassed by continuing to operate Line 5 on the Band's land without the Band's consent or a valid right-of-way. *Id.*, *5-12. Accordingly, "Enbridge must remove the pipeline from the Allotted Parcels." *Id.*, *19.

The same is true here. The State Officials allege that Enbridge does not have consent or a legal privilege to operate Line 5 in the Straits because its easement was terminated and revoked. Nothing in the PSA authorizes Enbridge to operate an oil pipeline on the State's land without its consent or a valid easement.

### B. The PSA preempts enacting regulations, not exercising property rights.

Enbridge's view that the PSA preempts the State from exercising its property rights finds no support in the statute's text or structure.

The preemption clause states: "A State authority may not adopt or continue in force safety standards" for interstate pipelines. 49 U.S.C. §60104(c). The ordinary meaning of those words, understood in context, bars state agencies from enacting pipeline-safety regulations for interstate pipelines. It does not prohibit state landowners from exercising property rights.

"Safety" means "[f]reedom from danger, risk, or injury"; and a "standard" is a "measure of comparison," "criterion," or "norm." *The American Heritage Dictionary of the English Language* 1142, 1256 (1969). Thus, safety standards are criteria for making pipelines less dangerous. At the federal level, minimum safety standards are promulgated by the Pipeline and Hazardous Materials Administration (PHMSA) through a specified process that includes technical engineering review. 49 U.S.C. §§60102, 60115. At the state level, they are adopted by agencies with "regulatory jurisdiction." *Id.* §60105(b)(1).

Safety standards apply to pipeline owners and operators—not states or landowners—and set criteria for pipeline design, operation, maintenance, and related activities. 49 U.S.C. §§60102(a)-(b); 49 C.F.R. pt.195. In practice, they "function as instructions for designers,

manufacturers, operators or users of equipment." Rafael G. Mora, *et al.*, *Pipeline Integrity Management Systems: A Practical Approach* §2.6.1 (ASME Press 2016).

### C. The PSA does not prohibit revoking the easement as void from inception.

In §I.B of the Notice, the State Officials revoked Enbridge's easement because it was not validly issued under the public-trust doctrine. (Notice, R.158, PageID.2353-56.) Enbridge says the PSA prohibits this because the public-trust doctrine requires reviewing "whether the pipeline poses a safety risk to the environment to convey a valid easement." (Enbridge Br., Dkt.37, p.39.) But Enbridge fails to engage with the State Officials' arguments for why §I.B of the Notice is not preempted.[3] (State Br., Dkt.13, pp.25-32.)

---

[3] Enbridge attempts to diminish the State's public-trust authority by citing the Submerged Lands Act's (SLA) reservation-of-powers. (Enbridge Br., Dkt.37, pp.5, 40.) But the federal government's constitutional powers over submerged lands are limited. (Flow/Sierra Club Br., Dkt.18, pp.11-16.) The SLA "does not purport to enlarge" them, *United States v. Stoeco Homes, Inc.*, 498 F.2d 597, 607 (3d Cir. 1974), much less "divest the individual States of control," *Murphy v. Dep't Nat'l Res.*, 837 F. Supp. 1217, 1221 (S.D. Fla. 1993). That can be done only through a separate act of Congress with a clear statement limiting the State's public-trust authority. The PSA comes nowhere close. (State Br., Dkt.13, pp.28-29.)

There's a difference between making *findings* about impacts to the public trust and imposing *standards* on a pipeline operator's conduct. The due-findings requirement governs *conveying a valid easement*, not designing, operating, constructing, or maintaining a pipeline. 49 U.S.C. §60102(a)(2)(B). It applies when prescribing the location of a structure on submerged lands, which is reserved to the states under §60104(e), and it regulates the conduct of state actors, not pipeline operators, *id.* §60102(a)(2)(A). It thus falls outside the PSA.

### D. The PSA does not prohibit exercising the easement's termination clause.

#### 1. Private landowners may enforce conditions in easement contracts.

When a pipeline company asks for permission to use another person's land, the PSA does not constrain the landowner to a binary choice: grant unencumbered access to the property (subject to only PHMSA's minimum safety standards) or grant no access at all. Instead, landowners and pipeline operators may negotiate contracts

that include mutually acceptable conditions.[4] This helps landowners "get to 'yes' on pipelines," and enables pipeline companies to obtain access to land. (Preemption Scholars Br., Dkt.26, p.11.) For this system to work, however, the terms of the contracts—and the state laws that undergird them—must be upheld. (Tribal Nat. Br., Dkt.27, p.5.)

Any private landowner could have done exactly what Michigan did here: grant only conditional access to its property, then exercise the contract's termination clause and direct the grantee to stop using the land when the conditions were violated.[5] *See SFPP, L.P. v. Union Pac. R.R. Co.*, 274 F. App'x 549, 550 (9th Cir. 2008) (PSA does not preempt "demanding compliance with a private agreement"). Indeed, "[t]he power to exclude has traditionally been considered one of the most

[4] *See* Peggy Kirk Hall, et al., *Understanding and Negotiating Pipeline Easements*, Ohio State Univ. Extension (May 23, 2016), https://tinyurl.com/ypuzzh5x.

[5] On appeal, Enbridge argues that the State Officials failed to comply with the contract's requirement to give 90 days' notice before termination and asserts (without support) that all breaches have been cured. (Enbridge Br., Dkt.37, pp.5-6, 33, 37, 45.) But the State Officials provided 180 days' notice—twice what the contract requires. (Notice, R.158, PageID.2352.) And, despite what Enbridge claims in its brief, Enbridge remains in breach today (five years later). In any event, these are state-law contract issues. They were not briefed or argued below, do not bear on federal preemption, and are not properly before the Court.

treasured strands in an owner's bundle of property rights." *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982).

### 2. Congress did not intend to treat state landowners worse than private landowners.

Enbridge cannot answer why Congress would restrict only state landowners' liberty of contract when negotiating pipeline easements. Enbridge attempts to fall back on the statutory language, which bars "State authorit[ies]" from "adopt[ing] or continu[ing] in force" pipeline "safety standards." (Enbridge Br., Dkt.37, p.37.) But that language must be read against the presumption that when a state "manage[s] its own property" in such a way that "analogous private conduct would be permitted," its conduct is not preempted. *Building & Constr. Trades Council v. Associated Builders & Contractors of Mass./R.I., Inc.*, 507 U.S. 218, 227 (1993); *Am. Trucking Ass'ns v. City of Los Angeles*, 569 U.S. 641, 651 (2013); *see also Texas v. Dep't of Homeland Security*, 123 F.4th 186, 205-06 & n.20 (5th Cir. 2024) (states act as proprietors when enforcing land rights).[6]

[6] To be clear, the State Officials argue only that the easement's termination for breach is proprietary. (Notice, R.158, §II, PageID.2362-

Enbridge says the State acted as a regulator because one of the easement's terms requires "exercis[ing] the due care of a reasonably prudent person for the safety and welfare of all persons and of all public and private property." (Enbridge Br., Dkt.37, p.34.) But *every* easement entails that requirement. *E.g.*, *Clark v. Dalman*, 150 N.W.2d 755, 760 (Mich. 1967); *Sutera v. Go Jokir, Inc.*, 86 F.3d 298, 300 (3d Cir. 1996). And private contracts often include similar provisions. *E.g.*, *SFPP*, 2006 WL 8448721, at *1; PIPA, n.7 below.

Enbridge also states that "PHMSA regulates these same subjects." (Enbridge Br., Dkt.37, p.35.) But PHMSA's safety standards are *minimums*. 49 U.S.C. §60102(a)(2). Pipeline operators may voluntarily exceed them, *Est. of Min. Safety Stds.*, 35 Fed. Reg. 13,248, 13,250 (Aug. 19, 1970), and agree by contract to hold themselves to a higher standard. Accordingly, private easement conditions often address topics regulated by PHMSA.[7]

---

68.) Revocation under the public-trust doctrine is something states do, not private landowners. (*Id.*, §I, PageID.2353-60.)

[7] *E.g.*, PIPA Recommended Practice BL07, https://primis.phmsa.dot.gov/stakeholder-comms/pipa/pipa-practice-bl07/ (conditions regarding "depth of cover," "product transported," "maximum size," and "maximum pressure"); Hall, n.4 above (similar); *SFPP*, 2006 WL 8448728, *2 (requiring additional cover).

Further, the leases in *Sprint Spectrum L.P. v. Mills*, 283 F.3d 404 (2d Cir. 2002), and *Superior Communications v. City of Riverview*, 881 F.3d 432 (6th Cir. 2018), also addressed the same subjects as federal regulations. There, federal safety standards set maximum radio frequency (RF) emission levels, and a statute barred local governments from "regulating" RF emissions. Yet, the Second Circuit held that they *could* "enforce a contractual provision dealing with such levels," *Mills*, 283 F.3d at 417, and this Court agreed, *Superior*, 881 F.3d at 445.

The logic of those cases applies equally here. Michigan has the right to refuse to grant an easement "except on agreed terms," and the narrowness of its conduct—"a single [easement] agreement with respect to a single [pipeline]"—defeats any inference that it sought to encourage a general policy. *Mills*, 283 F.3d at 420-21; Preemption Scholars Br., Dkt.26, pp.19-28. Enbridge cannot use the PSA to "shield it from its own commitments." *PCS Phosphate Co., Inc. v. Norfolk So. Corp.*, 559 F.3d 212, 222 (4th Cir. 2009) (cleaned up).

### 3. The PSA does not retroactively preempt design standards.

This case is also distinct because the 1953 easement was negotiated and entered, and the Straits Pipelines were built, long before the PSA was enacted. As even the district court recognized, excising the terms, conditions, and termination clause from the easement "deprive[s] [the State] of part of the bargain back in 1953." (Tr., R.160, PageID.2431.)[8] Because this raises antiretroactivity concerns, *Kia Motors Am., Inc. v. Glassman Oldsmobile Saab Hyundai, Inc.*, 706 F.3d 733, 740-41 (6th Cir. 2013), the PSA should not be interpreted to have that effect absent a clear statement of congressional intent, *Landgraf v. USI Film Prods.*, 511 U.S. 244, 272-73 (1994).

There is no clear statement here. Section 60104(c)'s reference to "continu[ing] in force" safety standards is best read to mean that regulations then on the books could no longer remain in force; not that prior contracts were nullified. Further, §60104(b) strongly indicates the PSA does *not* have retroactive effect. Under that provision, "[a] design,

[8] The prior panel also recognized that Enbridge's requested relief would diminish the State's land rights. *Enbridge Energy, LP v. Whitmer*, 135 F.4th 467, 475-77 (6th Cir. 2025).

installation, construction, initial inspection, or initial testing standard *does not apply* to a pipeline facility existing when the standard is adopted." 49 U.S.C. §60104(b) (emphasis added). This leaves prior agreements over such matters undisturbed. (State Br., Dkt.13, pp.45-48.) Indeed, while Enbridge says PHMSA now regulates things like pipeline curvature, span length, and coating (Enbridge Br., Dkt.37, pp.22-23, 35), those standards *do not apply* to the Straits Pipelines.

Further, as Enbridge admits, the 1953 easement *prescribes* the Straits Pipelines' location and route. (Enbridge Br., Dkt.37, p.41.) Section 60104(e) places pipeline location outside PHMSA's purview, further undermining any inference of clear congressional intent to disturb preexisting easement conditions. Enbridge's argument that "Section 60104(e) does not apply here because Line 5 is not a new pipeline facility" makes no sense because Line 5 *was* a new pipeline facility when the 1953 easement was entered. Moreover, the new/existing distinction that Enbridge tries to read into the statute is unsupported by the PSA's text and undermined by its history. (Preemption Scholars Br., Dkt.26, pp.13-15.)

#### 4. *If* the PSA preempts the easement's essential terms, the entire contract fails.

*If* the Court agrees with Enbridge that the PSA altered the parties' contract rights, it must consider the impact of that ruling on the remainder of the bargain. Enbridge does not even attempt a severability analysis. It just dismisses the State's argument as "farcical" because it does not like the result.[9] (Enbridge Br., Dkt.45, pp.45-46.) While that dismissiveness is consistent with Enbridge's casual approach to property rights, the Court should not indulge it. There is no credible way to find that Enbridge can keep the benefits of the 1953 bargain without fulfilling the promises it made in exchange. (State Br., Dkt.13, pp.48-50; Tribal Nat. Br., Dkt.27, pp.7-20.)

### E. Enbridge's counterarguments lack merit.

#### 1. The PSA does not preempt motives.

Enbridge's primary counterargument focuses on motives. (Enbridge Br., Dkt.37, pp.16-17, 26-27, 28, 31-33, 36.) Because

[9] The only severability case Enbridge cites does not help it because, there, the court held that the preempted provisions could not be severed, *so the entire statute had to be struck down*. *Kinley Corp. v. Iowa Utilities Bd.*, 99 F.2d 354, 359-61 (8th Cir. 1993).

PHMSA's safety standards aim in part at "protecting the environment," 49 U.S.C. §60102(b)(1)(B)(ii), Enbridge argues that state actors cannot do anything that is motivated by environmental concerns and has a more-than-incidental effect on pipelines. (Enbridge Br., Dkt.37, pp.31-32.) Section 60104(c) does not stretch that far. As PHMSA itself stated, "pipeline safety is a responsibility shared by all three levels of government—federal, state, and local—as well as by pipeline operators, excavators, and property owners."[10] Each stakeholder may act with safety motives, so long as they stay within their respective sphere.

The State Officials have good reasons to be worried about the severe risk of "catastrophe" posed by the Straits Pipelines. (Op., R.164, PageID.2504.) But they have not sought to shut down the Straits Pipelines "based on [their] personal opinion[s] that those pipeline operations are unsafe." (Enbridge Br., Dkt.37, p.33.) Instead, they undertook "a comprehensive review of Enbridge's compliance with the 1953 Easement," and issued the Notice only after concluding that the

[10] May 28, 2014 PHMSA Letter, https://pstrust.org/wp-content/uploads/2014/05/PHMSA-Letter-to-TransCanada-on-Role-of-Local-Governments-in-Pipeline-Safety.pdf

easement was void and Enbridge repeatedly breached its terms. (Notice, R.158, PageID.2353.)

Enbridge provides no support for looking past the legal grounds for the Notice and focusing instead on subjective motivation. (Enbridge Br., Dkt.37, pp.16-17.) Preemption ordinarily depends "on *what* the State did, not *why* it did it." *Virginia Uranium, Inc. v. Warren*, 587 U.S. 761, 774 (2019) (lead op. of Gorsuch, J.). Focusing on subjective motives risks "arbitrary outcomes" and creates "tremendous practical problems for courts." (Preemption Scholars Br., Dkt.26, pp.16-18.)

Here, for example, Enbridge fails to specify *whose* motive matters: is it the Governor's, the MDNR Director's, or the officials' who granted the easement in 1953? How is the relevant motive to be discerned? And why would Congress want the same *act* to be preempted or not depending on subjective intent?

Nothing in the PSA's text calls for a motives-based inquiry. The PSA prohibits doing certain things, not acting with certain motives. 49 U.S.C. §60104(c). The *Bad River* court thus rejected Enbridge's motives-based approach. Enbridge averred that, because the Band's nonrenewal of its rights-of-way had a more-than-incidental effect on

Line 5 and was motivated by safety concerns, it was preempted by the PSA. The district court correctly held otherwise, explaining that the PSA bars the "imposition of safety *standards*," not acting with safety motives. *Bad River v. Enbridge*, 626 F. Supp. 3d 1030, 1049 (W.D. Wis. 2022) (emphasis in original). That ruling went undisturbed on appeal.

### 2. Enbridge's cases are inapposite.

The cases that Enbridge cites also do not support its position. In each of them, local governments enacted pipeline-safety regulations. None of them involved the situation here: an exercise of property rights and the enforcement of land-use restrictions that were baked into an initial siting decision.

In *ANR Pipeline Co. v. Iowa State Commerce Comm'n*, 828 F.2d 465 (8th Cir. 1987), and *Kinley Corp. v. Iowa Utilities Bd.*, 99 F.2d 354, 356, 358-59 (8th Cir. 1993), Iowa enacted a pipeline-safety statute. It required interstate pipeline operators to secure permits from a state agency, which "mandate[d] safety standards," "interpret[ed] [PHMSA's] standards," and administered "an inspection program … to insure compliance." *ANR*, 828 F.2d at 474, 466-67, 472; *Kinley*, 99 F.2d at 356, 358-59. In *Williams Pipe Line Co. v. City of Mounds View*, 651 F. Supp.

551 (D. Minn. 1987), a county resolution required maintenance of an interstate pipeline to be done "under the supervision of the county engineer," who had had the right to "make all rules … he shall deem necessary." *Id.* at 553.

In *Couser v. Shelby County*, 139 F.4th 664 (8th Cir. 2025), counties "passed ordinances regulating pipelines" and imposed "requirements above and beyond those of the PHMSA." *Id.* at 667, 672. The panel unanimously held that the PSA preempted the counties' emergency-plan regulations but divided 2-to1 over zoning setbacks. *Id.* at 670-72, 677. Splitting from the Fourth and Fifth Circuits, the majority found the setbacks preempted because they were county-wide standards adopted to regulate safety, not "particularized" judgments about a specific location or route. *Id.* at 670-72.

In *Olympic Pipe Line Co. v. City of Seattle*, 437 F.3d 872 (9th Cir. 2006), Seattle sought to use its permitting power to force a pipeline company to comply with 33 safety demands, including performing safety tests. *Id.* at 875-76, 882 n.27. Enbridge says *Olympic Pipe* involved "contractual rights in the underlying easement," (Enbridge Br., Dkt.37, p. 35), but that's wrong in two respects. *First*, Seattle did not

grant an easement; it issued a franchise, which is an exercise of the police power and not a conveyance of property rights.[11] *Second*, the case did not involve an "underlying" agreement. The pipeline was built in 1964, and Seattle sought to impose new requirements in a 1991 permit. *Olympic Pipe Line Co. v. City of Seattle*, C03-2343L, 2003 WL 27392855, *1 (W.D. Wash. Aug. 21, 2003). *That's* why the district court said "[t]he location and routing of the pipeline has already been established"; Seattle was seeking to impose new requirements in a permit that post-dated construction by nearly 30 years. *Id.*, *4.

Here, by contrast, Michigan sold Enbridge a limited interest in land. The 1953 easement contract was entered *before* Enbridge constructed the Straits Pipelines and it *prescribes* their location and route. The terms of the easement—including the right to terminate for

---

[11] *See, e.g.*, *People's Pass. Co. of Memphis v. Memphis City R. Co.*, 77 U.S. 38, 51 (1869) ("franchises are special privileges conferred by the government"); *Thompson v. Schenectady Ry. Co.*, 124 F. 274, 279 (N.D.N.Y. 1903) ("The 'franchise,' the charter granted by the state, is one thing; the property rights, including rights of way which the chartered body may acquire from private individuals, is quite another."); *Texas & P. Ry. Co. v. City of El Paso*, 85 S.W.2d 245, 249 (Tex. 1935) ("There exists a clear distinction between a franchise and an easement. The grant of a franchise does not carry with it an interest in land....an easement is essentially an interest in land."); 49 N.Y. Jur. 2d Easements § 5; 36 Am. Jur. 2d Franchises from Public Entities § 2.

breach—were integral to that initial siting approval. Without them, Michigan would never have allowed Enbridge to construct or operate the Straits Pipelines on its land. (State Br., Dkt.13, pp. 49-50.)

### 3. The PSA does not preempt remedies.

Enbridge asserts that "Michigan retains its rights as property owner but the PSA preempts the remedy sought by the Governor." (Enbridge Br., Dkt.37, p.33.) This is an odd argument, once again ungrounded in statutory text. Congress knows how to preempt remedies when it wants to. *See, e.g.*, 49 U.S.C. §10501(b) ("[T]he remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law."). But the PSA does *not* "substitut[e]" exclusive "remedies by force of federal law." (*Contra* Enbridge Br., Dkt.37, p.46.)

The PSA preempts enacting *standards*, 49 U.S.C. §60104(c), not seeking *remedies*. Indeed, the PSA preserves state law, §60120(c), authorizes states to seek judicial relief, *id.* §60121(a), and expressly does not limit "any other remedies provided by law," *id.* §60121(d). Enbridge's suggestion that the PSA changes the remedies available to

vindicate property rights finds no basis in the PSA's text and cannot be squared with *Bad River*, 2026 WL 2198120, *19.

It is also unclear what "remedy" Enbridge thinks is preempted. The State Officials revoked and terminated the easement effective May 12, 2021, and directed Enbridge to "cease operation of the Straits Pipelines" on that date. (Notice, R.158, PageID.2371.) But May 12, 2021, has come and gone. The State Officials maintain that the 1953 easement was terminated and revoked, and Enbridge is occupying the State's submerged lands without consent or a legal privilege. But the only *remedy* any state actor is currently seeking is in *Nessel*. (State Br., Dkt.13, p.12-13.) And the proper remedy in that case will be decided by the *Nessel* court after a ruling on the merits.

#### 4. Enbridge's consequentialist arguments are misplaced.

Enbridge and its amici purport to be making "purely legal" arguments that do not require "factual findings,"[12] but then try to bias this Court's statutory interpretation with *vehemently* disputed and untested factual allegations. The Court should not be led astray. *See*

[12] Enbridge Br, Dkt.37, p.20; U.S. Br., Dkt.52, p.24.

*Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 279 (2023) (consequentialist arguments have no role in statutory interpretation); *Niz-Chavez v. Garland*, 593 U.S. 115, 171 (2021) (same).

For example, Enbridge says "[i]t is undisputed that if the Straits portion of Line 5 closes, all of Line 5 will be shut down"; but that *is* disputed. (*Compare* Enbridge Br., Dkt. 37, p.2, *with* State Br., R.137, PageID.1798.) The Straits Pipelines are 4 miles long, and the remaining 641 miles of Line 5 could be used, for example, to send products to the fractionator in Rapid River, Michigan, or from the injection point in Lewistown, Michigan to the refineries down the line. Further, the State Officials have not opposed a reroute, including through the proposed tunnel—for which MDNR has issued a separate easement—or along Lake Superior's northern shore.[13]

Enbridge's amici suggest that not using the Straits Pipelines would require shuttering the refineries Line 5 supplies.[14] But the best available evidence shows that—even without a reroute—the refineries

[13] *See* State Br., Dkt.13, pp.8-9; Press Release, https://news.ontario.ca/en/release/1007698/ontario-unveils-proposed-route-for-northern-shield-energy-corridor (last visited Aug. 28, 2026).

[14] NABTU Br., Dkt.39, pp.7-16; W.Va. Br., Dkt.43, pp.11-12; API Br., Dkt.48, pp.6-9; Canada Br., Dkt.53, p.8.

could continue receiving the same volume of propane and crude with modest infrastructure changes and no material increase in price.[15] The U.S.'s "massive network" of infrastructure is not so fragile as to crumble if Enbridge cannot use four miles of pipe. (Enbridge Br., Dkt.37, p.1.)

Enbridge also predicts that unless the Court preempts the Notice, other jurisdictions will bring similar claims "and the interstate pipeline system will collapse, bringing American life as we know it to a standstill." (*Id.*, 3.) That could hardly be more hyperbolic. And it assumes that pipeline companies routinely breach their contracts and occupy land without permission—in which case those landowners' rights *should* be vindicated. Otherwise, landowners will be disincentivized from contracting with pipeline companies for fear their bargains will not be honored.

[15] *See, e.g.*, Press Release, https://www.michigan.gov/ag/news/press-releases/2023/11/17/attorney-general-nessel-lauds-game-changing-line-5-report (Nov. 17, 2023).

## II. Neither the Foreign Affairs Doctrine nor the 1977 Treaty preempts the Notice.

### A. The Notice cannot be preempted by mere policy or incidental impacts on foreign relations.

Relying heavily on *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396 (2003), Enbridge and the U.S. argue that the Notice is preempted because it interferes with foreign policy and disturbs relations with Canada. (Enbridge Br., Dkt.37, pp.56-61; U.S. Br., Dkt.52, pp.20-23.) That argument fails.[16]

*Garamendi* is an exceptional case that has been strictly limited. Without any "serious claim to be addressing a traditional state responsibility," California enacted a law to facilitate litigation of insurance claims "based on acts perpetrated in the Holocaust." 539 U.S. at 409, 419 n.11. The law "effectively single[d] out only policies issued by European companies, in Europe, to European residents, at least 55 years ago." *Id.*, 425-26. Meanwhile, the President entered into

[16] Preemption is a question of law that merits no special deference. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391-92 (2024); *Holder v. Humanitarian L. Project*, 561 U.S. 1, 34 (2010). Further, the prior administration suggested that prohibiting a transit pipeline from operating without a valid easement is not "inconsistent with the United States' foreign policy," and the Seventh Circuit agreed. *Bad River*, 2026 WL 2198120, *18.

executive agreements with Germany, Austria, and France to establish an "exclusive mechanism" for resolving such claims. *Id.*, 406, 421-22. The Court held 5-to-4 that "[t]he issue of restitution for Nazi crimes" was "the Executive's responsibility"—not individual states'—and there was a "sufficiently clear conflict" between California's law and the executive agreements "to require finding preemption." *Id.*, 420-21.

The Court cabined *Garamendi* in *Medellín v. Texas*, 552 U.S. 491 (2008). Texas sentenced Mexican nationals to death despite an International Court of Justice ruling and a Presidential memorandum declaring the express foreign policy of the United States. *Id.*, 501-04. That surely disturbed foreign relations with Mexico. *Id.*, 524. Yet, the Court held that Texas's action could not be preempted by mere policy or incidental impacts on foreign relations. The Court distinguished *Garamendi* because the executive agreements there were within "[t]he Executive's narrow and strictly limited authority to settle international claims disputes"—a unique context where "a history of congressional acquiescence" gives Executive action the power to preempt. *Id.*, 531 (cleaned up). Other foreign policies below a treaty cannot preempt,

much less "reach[] deep into heart of the State's police powers" and stop a State from enforcing its criminal laws. *Id.*, 531-32.

Since *Medellín*, the Court has repeatedly reiterated that preemption must be grounded in "constitutional text, federal statute, or treaty" and cannot be based on mere "tension with federal objectives" or "brooding federal interest." *Kansas v. Garcia*, 589 U.S. 191, 202 (2020) (collecting cases). The State Officials cited these cases, but Enbridge and the U.S. ignore them. Besides *Garamendi*, the only case that either cites is *Saleh v. Titan Corp.*, 580 F.3d 1 (D.C. Cir. 2009) (U.S. Br., Dkt.52, p.20). But *Saleh* was abrogated just last term by *Hencely v. Fluor Corp.*, 146 S.Ct. 1086, 1093-99 (2026), where the Court reiterated these principles and rejected preemption based on federal interests.

Like *Medellín*, this case involves conduct deep within the State's sovereign powers. 552 U.S. at 532. "[A]s sovereign entities in our federal system, the States possess an absolute right to all their navigable waters and the soils under them." *Tarrant Reg'l Water Dist. v. Hermann*, 569 U.S. 614, 631 (2013) (cleaned up). Ownership and control of submerged lands is "an essential attribute of sovereignty." *Id.* (citation omitted). Neither executive policy nor incidental impacts on

foreign affairs can strip Michigan of its authority to act in this area of traditional state concern. (Foreign Relations Prof. Br., Dkt.28, pp.8-16.) Only the supreme Law of the Land can suffice. U.S. Const., art.VI, cl.2, amend. X.

### B. Enbridge has no standing or right of action to bring a Treaty-based preemption claim.

While the 1977 Transit Treaty has the power to preempt under the Supremacy Clause, Enbridge is an incidental beneficiary with neither standing nor a right of action to sue for an alleged Treaty violation in domestic court. (State Br., Dkt.13, 57-58.) Enbridge thus asks the Court to create a cause of action in equity. (Enbridge Br., Dkt.37, pp.52-53.) The Court should decline.

Plaintiffs can often "sue in equity without a congressionally-provided cause of action to prevent an injurious act by a public officer." *Trump v. Cook*, 146 S.Ct 2234, 2251 n.2 (2026) (cleaned up). But that "judge-made remedy" "is subject to express and implied statutory limitations." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) (holding that plaintiffs could not bring an equitable preemption claim). Thus, "even in a case involving relief sought under

*Ex parte Young*, courts must determine whether Congress intended private parties to enforce the statute by private injunction." *Mich. Corr. Org. v. Mich. Dep't of Corr.*, 774 F.3d 895, 905 (6th Cir. 2014).

In the treaty context, this analysis starts with "the background presumption…that international agreements, even those directly benefiting private persons, generally do not create private rights or provide for a private cause of action in domestic courts." *Medellín*, 552 U.S. at 506 n.3 (citation omitted). This presumption applies "*[e]ven when treaties are self-executing in the sense that they create federal law*." *Id.* (emphasis added). Additionally, "[t]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Mich. Corr.*, 774 F.3d at 903. When a law contains a specified enforcement mechanism, courts have "refused to supplement that scheme with one created by the judiciary." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 74 (1996).

Here, nothing in the Transit Treaty overcomes the presumption against the private enforceability of international treaties. To the contrary, the Treaty contains an enforcement mechanism that contemplates the involvement of neither nonparties nor courts: any

dispute regarding its "interpretation, application or operation" is to be resolved by the Treaty parties through dispute resolution and arbitration. Treaty, 28 U.S.T. 7449, art.IX(1).[17] This nonjudicial enforcement mechanism precludes an inference that the treaty was meant to be enforceable in domestic courts.[18] (Foreign Relations Prof. Br., Dkt.28, pp.18-19.) The Court should decline to supplement the Treaty's express remedy with a judge-made right for nonparties to enforce it by private injunction. *Michigan Corr.*, 774 F.3d at 905.

### C. The Court cannot find Treaty-based preemption without interpreting the Treaty.

If the Court *does* allow Enbridge to bring a Treaty-based claim, the Court cannot resolve that claim without interpreting the Treaty's terms. For the Notice to be preempted, it must be the Treaty—not an underlying policy—doing the work. *Cf. Head v. Strange*, 127 F.4th 630,

---

[17] Canada argued below that "it is the Article IX process—not this Court—that is charged with making substantive determinations under the 1977 Treaty." (Canada Br., R.133, PageID.1730.) The U.S. similarly "urge[d] the Court not to address the Transit Treaty." (U.S. Br., R.140, PageID.2037.)

[18] The right-of-action issue was not raised or decided in *Asakura v. City of Seattle*, 265 U.S. 332 (1924), and the treaty at issue there contained no specific enforcement provision.

636 (6th Cir. 2025). And the best way to discern the Treaty's policy is to interpret its text. *United States v. Stuart*, 489 U.S. 353, 372 (1989) (Scalia, J. concurring) ("[O]ur traditional rule of treaty construction is that an agreement's language is the best evidence of its purpose and its parties' intent."). Contrary to Enbridge's suggested approach (Enbridge Br., Dkt.37, p.58), the Court cannot divine the Treaty's policy—and find preemption—by cherry picking parts of its language without "engag[ing] in a full interpretation."

**D. The Treaty does not preempt the Notice.**

Enbridge's broad view of the Treaty's preemptive scope has staggering implications. Enbridge contends that, when a pipeline company occupies another's land without consent, Article II of the Treaty bars any state or private landowner from seeking injunctive relief that would "in any way" impede, divert, redirect, or interfere with the transmission of hydrocarbons. (Enbridge Br., Dkt.37, pp.49-50.)

The Treaty does not reach so deeply into the heart of state property rights. "Notwithstanding the provisions of Article II," Article IV expressly reserves the usual powers of "appropriate government authorities having jurisdiction," so long as they treat

transit pipelines "in the same manner" as others. 28 U.S.T. 7449, art.IV. Reading the provisions together, measures otherwise prohibited under Article II are permissible if they fall within Article IV.

Enbridge tries to limit this by arguing that "Article IV narrowly addresses 'regulations.'" (Enbridge Br., Dkt.59, p.60.) But the Treaty says otherwise. "[R]egulations, *requirements, terms and conditions*" may be imposed under Article IV. 28 U.S.T. 7449, art.IV(2) (emphasis added). Enbridge reads "requirements, terms and conditions" out of the agreement. This is notable because Canada admits that the "terms and conditions" for operating a pipeline may include "obtaining easements." (Can. Br., Dkt.53, p.13.) And a long string of Presidential Permits confirms that a condition for operating transit pipelines is that they must be sited on easements that are valid under state law. (State Br., Dkt.13, p.65.)

This does not "render[] Articles II and V superfluous." (*Contra* Enbridge Br., Dkt.37, p.60.) Article II prohibits public authorities from imposing measures that do not fall within Articles IV or V and impede the flow of hydrocarbons. That would bar actions such as the 1973 oil embargo that precipitated the Treaty and made it prudent for the U.S.

and Canada to protect against service disruptions caused by political measures, especially given the rise of economic nationalism. *See* S. Exec. Rep. No. 95-9, pp.23, 33, 37.

Article V addresses circumstances that aren't governed by generally applicable requirements—"an actual or threatened natural disaster, an operating emergency, or other demonstrable need"—and necessitate treating one pipeline differently than others and managing shortfalls. Article V does not override Article IV; the provisions work in tandem and reserve different powers that apply in different situations. S. Exec. Rep. No. 95-9, p.2.

The Senate Report indicates that the Treaty was not intended to change existing law or "interfere with the normal powers of the provinces or states," "so long as those powers are not used to discriminate against transit pipelines." S. Exec. Rep. No. 95-9, pp.5, 86. And it contains *no* discussion of nullifying preexisting land rights or limiting the remedies available in courts of law—which one would surely expect if the Treaty were intended to have Enbridge's meaning.

Reading the Treaty to retroactively nullify intrastate property rights would readjust the balance of state-and-national authority,

raising serious federalism concerns. *See Bond v. United States*, 572 U.S. 844, 874 (2014); *id.*, pp.882-96 (Thomas, J. concurring). There is no reason to require any less of a clear statement for Congress to accomplish that result via the Treaty Power rather than under the Commerce Clause. *See id.* Indeed, the Supreme Court has long been concerned about treaty interpretations that impair property rights. *See, e.g.*, *Strother v. Lucas*, 37 U.S. 410, 438 (1838); *Delassus v. United States*, 34 U.S. 117, 118 (1835); *United States v. Percheman*, 32 U.S. 51, 51-52 (1833). And the requirement to obtain valid rights-of-way is a shared expectation in both countries,[19] acknowledged during the Senate proceedings. S. Exec. Rep. No. 95-9, pp.51-52.

While the U.S. has declined to offer its own interpretation of the Treaty, it has suggested that it "does not interpret the Transit Treaty to foreclose injunctive relief in all forms." *Bad River*, 2026 WL 2198120, *18. The Seventh Circuit agreed, holding that injunctive relief is "allowed and warranted" and "Enbridge's trespass cannot continue

[19] *See* https://natural-resources.canada.ca/energy-sources/fossil-fuels/faqs-federally-regulated-petroleum-pipelines-canada (last visited Aug. 28, 2026) ("Pipeline companies are responsible for attempting to negotiate easements with landowners.").

unchecked." *Id.*, *19. *If* the Court interprets the Treaty, it should adopt no more stringent interpretation here.

In prior briefs, the U.S. has suggested that trial courts should consider the "possibility that an arbitral panel" could find a treaty violation and award damages against the U.S. when evaluating the public-interest factor for injunctive relief. U.S. Br., *Bad River Band v. Enbridge*, Nos. 23-2309, 23-2467, Dkt.92, pp.28-30 (7th Cir. Apr. 8, 2024). The Seventh Circuit cosigned that approach. *Bad River*, 2026 WL 2198120, *18-19. The *Nessel* court can employ it at the remedy stage if the Attorney General prevails on the merits. But that court—unlike this Court—would have the benefit of an evidentiary record and a prior adjudication on the merits. And it would not need to reach a definitive Treaty interpretation but would rather fashion an equitable remedy to provide relief while minimizing any adverse impacts on the public interest. The Court should reject Enbridge's efforts to cut that off at the pass.

## III. The district court erred by unnecessarily deciding the constitutional preemption questions in this case.

The State Officials could not have more clearly raised the constitutional-avoidance issue below. (Tr., R.160, PageID.2441.) Antecedent state-law issues are supposed to be decided before federal preemption, *Torres v. Precision Indus., Inc.*, 938 F.3d 752, 757 (6th Cir. 2019), and there are multiple state-law claims and defenses pending in *Nessel* that could render this action moot in whole or part. (*See* R.121-3, R.121-4, R.121-5, R.121-8.) Rather than prematurely intervening as a court of equity, the district court should have stayed this action so the state-law issues could be decided first. *See, e.g.*, *Martin v. Creasy*, 360 U.S. 219, 224 (1959); *Muskegon Theaters, Inc. v City of Muskegon*, 507 F.2d 199, 201-04 (6th Cir. 1974).

This would not prejudice Enbridge because the State Officials withdrew their lawsuit in deference to *Nessel* and have not sought to enforce the Notice since then. The only effect would be to avoid adjudicating complex constitutional issues involving deeply held sovereign interests until "absolutely necessary." *Torres*, 938 F.3d at 754 (quoting *Ashwander v. TVA*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring)).

## CONCLUSION AND RELIEF REQUESTED

The Court should either reverse or vacate and remand with instructions to stay.

Respectfully submitted,

*/s/ Keith D. Underkoffler*
Keith D. Underkoffler
Echo Aloe
Assistant Attorneys General
Environment, Natural Resources, and Agriculture Division
P.O. Box 30755
Lansing, MI 48909
517-335-7664
underkofflerk@michigan.gov
aloee1@michigan.gov

Daniel P. Bock
Special Assistant Attorney General
Fahey Schultz Burzych Rhodes PLC
4151 Okemos Road
Okemos, MI 48864
517-312-3130
dbock@fsbrlaw.com

Dated: August 28, 2026

## CERTIFICATE OF COMPLIANCE

Certificate of Compliance with Type-Volume Limit,
Typeface Requirements, and Type Style Requirements

1. This reply brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(ii) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this reply brief contains no more than 6,500 words. This document contains 6,493 words.

2. This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Word 2013 in 14-point Century Schoolbook.

*/s/ Keith D. Underkoffler*
Keith D. Underkoffler
Echo Aloe
Assistant Attorneys General
Environment, Natural
Resources, and Agriculture
Division
P.O. Box 30755
Lansing, MI 48909
517-335-7664
underkofflerk@michigan.gov
aloee1@michigan.gov

Daniel P. Bock
Special Assistant Attorney General
Fahey Schultz Burzych Rhodes PLC
4151 Okemos Road
Okemos, MI 48864
517-312-3130
dbock@fsbrlaw.com

## CERTIFICATE OF SERVICE

I certify that on August 28, 2026, the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record (designated below).

*/s/ Keith D. Underkoffler*
Keith D. Underkoffler
Echo Aloe
Assistant Attorneys General
Environment, Natural
Resources, and Agriculture
Division
P.O. Box 30755
Lansing, MI 48909
517-335-7664
underkofflerk@michigan.gov
aloee1@michigan.gov

Daniel P. Bock
Special Assistant Attorney
General
Fahey Schultz Burzych Rhodes
PLC
4151 Okemos Road
Okemos, MI 48864
517-312-3130
dbock@fsbrlaw.com

LF: Enbridge Straits (Dec & Inj Relief) (v DNR) 6COA/LF# 2020-030646-D/Enbridge v. Whitmer CA6 Reply Brief 2026-08-28